[No. S009169. Nov. 1, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
MARTIN JAMES KIPP, Defendant and Appellant.

**COUNSEL**

Ross Thomas and John Ward, under appointments by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood, Janelle M. Boustany and Robert B. Shaw, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**KENNARD, J.**—Defendant Martin James Kipp appeals from a judgment of death upon his conviction by jury verdict of one count of murder in the first degree (Pen. Code, § 187),[1] with the special circumstance of murder in the commission of rape (§ 190.2, subd. (a)(17)(C)), and one count each of forcible rape (§ 261, subd. (a)(2)) and robbery (§ 211). The jury that returned these verdicts as to guilt and special circumstance also returned a penalty verdict of death for the offense of first degree murder. The trial court denied the automatic motion to modify penalty (§ 190.4, subd. (e)) and sentenced defendant to death.

---

[1]All further statutory references are to the Penal Code unless otherwise indicated. ·

This appeal from the judgment of death is automatic. (§ 1239, subd. (b).) We will affirm the judgment in its entirety.

FACTS AND PROCEEDINGS

This court has affirmed a judgment of death against defendant for the murder of Antaya Yvette Howard in Orange County in December 1983. (*People v. Kipp* (1998) 18 Cal.4th 349 [75 Cal.Rptr.2d 716, 956 P.2d 1169].) In the trial of that case, the prosecution introduced evidence that defendant had raped and murdered Tiffany Frizzell in Los Angeles County in September 1983. (*Id.* at pp. 360-361, 369-373.) In this case, we consider the separate and later death judgment against defendant for the Frizzell murder.

A. *Prosecution's Guilt Phase Case-in-Chief*

On Thursday, September 15, 1983, Tiffany Frizzell, age 18 years, left her home in Indianola, Washington, and traveled to Long Beach, California, to attend Brooks College. Because the dormitories at Brooks College did not open until Saturday, September 17, she took a room near the college at the Ramada Inn on Pacific Coast Highway in Long Beach.

On the morning of September 17, 1983, the housekeeping staff at the Ramada Inn discovered Tiffany Frizzell's lifeless body face up on the bed in her room. The bed was neatly made, and the body was on top of the sheets and blanket, but under the bedspread. An article of clothing described as a sunsuit or jumpsuit covered her face under the bedspread. She was wearing a blouse without a bra, and she was naked from the waist down. Around her neck was a cloth belt pulled very tight. There were no signs of forced entry into the room, and no indication that a struggle had taken place there. Frizzell's purse, driver's license, and some $130 in cash were found in a dresser in the room. A small hook, evidently from her missing bra, was found embedded in the skin of her back. The fingernail on the middle finger of her left hand was broken. A damp bathing suit was hanging in the bathroom. Defendant's fingerprint was found on the telephone in the room.

A criminalist employed by the Los Angles County Sheriff used a standard sexual assault kit to obtain evidence from Frizzell's body. Examination and analysis of the materials obtained in this way revealed the presence of semen and sperm in Frizzell's vagina and on her external genital area, but not in her mouth or rectal area.

A deputy medical examiner employed by the Los Angeles County Coroner performed an autopsy of Frizzell's body. When he removed the belt from

her neck, he found a deep ligature mark underneath. Scratches near this ligature mark were consistent with fingernails. Petechial hemorrhages in the eyes and scalp were consistent with strangulation. There was a bruise on the abdomen, four and one-half inches to the left of the navel, a bruise on the outside of the front of the left thigh, a bruise on the top of the left shoulder, and a small abrasion on the back of the left hand. These injuries all occurred before death, but the absence of healing indicated they were fresh, within 48 hours of death. There was no trauma to the external vaginal or anal areas, but there was redness and erosion of the cervix consistent with sexual intercourse. The cause of death was asphyxiation due to ligature strangulation.

On Monday, September 19, 1983, a gardener working at a residence in Long Beach found a canvas bag in some bushes next to an alley. He gave the bag to the woman who owned the residence, and she gave it to the police. The residence where the bag was found was a half-mile from the Ramada Inn where Frizzell's body was found. The bag contained a camera, a purse, cosmetics, a pair of shorts, a terry cloth robe, a washcloth, four socks, a bra that was torn and missing a fastener, a newspaper dated September 16, 1983, a magazine, a map of the City of Long Beach, about $10 in cash, an apparently used tampon, and a book with Tiffany Frizzell's name written inside the cover. At trial, Tiffany Frizzell's mother identified the handwriting and signature in the book as Tiffany's, and she identified the camera, the shorts, the bra, and the purse as items belonging to Tiffany. Tiffany's fingerprints were found on the book and the magazine. Defendant's fingerprints were found on the book.

On October 18, 1983, defendant sold a personal stereo and a cassette player to a secondhand goods dealer in Westminster for $70. At trial, Tiffany Frizzell's mother identified these two articles as property that had belonged to Tiffany.

The prosecution introduced in evidence a 16-page letter that defendant wrote and sent to his wife, Linda Anne Kipp, while both were in custody at the Orange County jail. The letter was found in an envelope postmarked September 15, 1987. In this letter (hereafter September 15 letter), defendant admitted he had "raped" and "killed" Tiffany Frizzell.

To further demonstrate consciousness of guilt, the prosecution introduced evidence that while he was in custody for the murder of Tiffany Frizzell, and before he was tried for that offense, defendant made two attempts to escape, first from the Orange County jail and then from the Los Angeles County jail. This evidence revealed the following facts.

On April 15, 1987, Tom Giffin, an investigator for the Orange County Sheriff, met Linda Anne Kipp, defendant's wife, at a restaurant. Giffin was

working undercover, posing as a narcotics dealer. During that meeting and other meetings and telephone conversations over the next two days, Linda Kipp asked Giffin to assist her in helping defendant escape from the Orange County jail. Giffin pretended to agree. On April 16, defendant discussed the escape plan with Giffin during a telephone conversation. Defendant agreed to pay Giffin $1,000 for his help, with $500 in advance and the rest after the escape. As defendant described it to Giffin, the plan called for Giffin to accompany Linda Kipp's son to the jail. From a public lobby, they would enter a public restroom. In the restroom, Giffin would remove the ceiling grate covering the air conditioning duct and assist Linda Kipp's son to climb into the duct. The son would then somehow make his way to defendant through the ducts and guide him back to the public restroom. Giffin would wait in the restroom until Linda Kipp's son returned with defendant. The three of them—defendant, Giffin, and Linda Kipp's son—would then leave the restroom and walk out of the jail. On April 17, Linda Kipp gave Giffin $500 in cash. The next day, Linda Kipp was arrested for her role in the planned escape.

On January 1, 1988, around 11:30 p.m., a guard at the Los Angeles County jail heard a loud noise from the vicinity of defendant's cell. Upon investigation, he found that defendant was not in the cell, and he saw a rope hanging from a hole in the ceiling of the cell. After summoning assistance, the guard called for defendant to come down. Eventually defendant lowered himself through the hole and was immediately grabbed by the legs. Defendant was combative but was quickly subdued. Defendant then told the guards it was lucky they had caught him because he would have been gone by morning.

B. *Defense Case at the Guilt Phase*

The defense called no witnesses and offered no exhibits at the guilt phase.

C. *Guilt Verdicts*

The jury returned verdicts finding defendant guilty of the charged offenses of robbery, rape, and murder. The jury found the murder to be of the first degree, and it found true the special circumstance allegation that the murder occurred during a rape. The jury was unable to reach a verdict on another special circumstance allegation, that the murder occurred during a robbery.

D. *Prosecution's Penalty Phase Case in Aggravation*

For its case in aggravation, the prosecution presented evidence that defendant assaulted and raped June M. in June 1981, that he was convicted of rape

in December 1981, that he assaulted and threatened to kill Loveda N. in November 1983, that he sexually assaulted and murdered Antaya Yvette Howard in December 1983, and that he threatened to kill a sheriff's sergeant after his unsuccessful attempt to escape from the Los Angeles County jail in January 1988. The following is a summary of this evidence.

Between 10:30 and 11:00 p.m. on June 13, 1981, June M. went to a bar on Pacific Coast Highway in Long Beach. There she met defendant, with whom she had no prior acquaintance, and they began talking about custom pickup trucks. Defendant invited her outside to inspect his truck, and she accepted. A windowless shell had been welded to the bed of defendant's truck, making it similar to a van. As they were sitting in the truck, with defendant in the driver's seat and June M. in the passenger seat, defendant turned on the stereo and told June M. to shut the door on her side so she could hear the music better. As soon as she shut her door, defendant drove off, hitting a car on his way out of the parking lot.

Defendant stopped the truck in a residential area. June M. asked to be taken back, but defendant said they were going to a party and told her to remove her shoes. She noticed there was no inside door handle on the passenger side. Vise grips appeared to function as a makeshift door handle, but they came off when she grasped them. Defendant pushed her into the back of the truck and started to remove her clothes. When she screamed, defendant put a hand in her mouth, and when she bit his hand he began to strangle her. Defendant finished removing her clothes and raped her. Eventually her body went limp. She was unable to breathe and believed she was dying. Defendant demanded she orally copulate him. She said she would if defendant gave her some fresh air. When defendant opened the door, she jumped out and ran away, eventually flagging down a motorist and reporting the incident to the police. June M. had severe bruises on her neck and wore a neck brace for two weeks after this incident.

The parties stipulated that for his conduct in this incident defendant was convicted of rape, a felony, on December 4, 1981.

On November 10, 1983, defendant and Loveda N. had an intimate relationship and were sharing a room at a motel in Coos Bay, Oregon. During the early morning hours, after they had been drinking together at a bar near the motel, they began to argue. When Loveda N. refused to have sex with defendant, he started hitting her in the head with his fists and choking her. Thinking she was about to lose consciousness, Loveda N. told defendant she needed to go to the bathroom because she was about to vomit. Once inside the bathroom, she locked the door and climbed through the window. As she

was leaving, she heard defendant kicking down the door. She ran to the manager's office, and the police came and took defendant into custody. Loveda N. did not press charges against defendant because he told her that if she did he would kill her and her son. After the assault, Loveda N. had bumps on her head in the temple area where defendant had hit her, her throat was bruised where defendant had choked her, and she had difficulty speaking for around two weeks.

On December 29, 1983, Antaya Yvette Howard, who was then 19 years old, left her home in Huntington Beach, California, after 10:00 p.m. She was driving her car, a small hatchback model. At 3:00 a.m. the next day, she was seen drinking champagne with defendant at a restaurant in Newport Beach. Four hours later, a woman noticed a car, later identified as Howard's, parked in an alley in Huntington Beach. The woman telephoned the police on January 4, 1984, because the car had not moved and was emitting a foul odor.

The police found Howard's badly decomposed body, covered by a blanket, in the hatchback area of the car. Her blouse was open and missing two buttons. Her bra had been rolled up exposing her breasts. Her jeans and underpants were around her ankles. The jeans were muddy, especially on the left side. Defendant's fingerprints were found on the exterior window glass of the car's two front doors and on a beer can found on the front passenger floorboard.

An autopsy of Howard's body indicated that the cause of her death was asphyxiation due to strangulation, with trauma to the head as a contributing cause. Abrasions were found on her left forehead, left eyebrow, left thigh, and lower back. Bruises were found on her left eyebrow, left cheek, the back left side of her head, her left shoulder blade, and left thigh. There was internal bleeding, called ecchymosis, in her eyes. Internal bleeding was also noted in her head and neck. The injuries were consistent with having been struck on the back of the head with a blunt object and with strangulation by pressure to the front of the neck.

Huntington Beach police officers interviewed defendant on January 10, 1984. Defendant denied knowing Antaya Howard and could not explain the presence of his fingerprints on her car.

In January 1988, when defendant was handcuffed immediately after his unsuccessful attempt to escape from the Los Angeles County jail, defendant said he would kill a sheriff's sergeant who had assisted in subduing him, and that he would do it in a "big way" and a "humiliating way" because he had

"nothing to lose." In the ceiling area above defendant's cell, investigators found objects that could be used as tools or weapons, including two dinner knives (one of which had been sharpened) and two sharpened pieces of sheet metal.

The prosecution also presented the expert testimony of a martial arts instructor on the meaning of the term "dim mak." In the September 15 letter that defendant had sent to his wife, and that jail authorities had intercepted, defendant had written that he had killed Antaya Howard with a "Dim-Mak technique." The witness testified that "dim mak" literally means "death touch" and that in martial arts it refers to striking blows to certain pressure points on the body, resulting in unconsciousness or death.

E. *Defense Penalty Phase Case in Mitigation*

For its case in mitigation, the defense presented expert testimony about the history of the Blackfeet Tribe, of which defendant is a member, and evidence concerning defendant's life history. Psychologist Craig William Haney provided expert opinions on how certain aspects of defendant's history had affected his development.

According to the testimony, the Blackfeet in the late 1700's were divided into three major subgroups: the Piegan or Southern Blackfeet, the Blood or Kiowa, and the Northern Blackfeet. At this time, the Blackfeet were a nomadic, buffalo-hunting, teepee-dwelling Plains tribe, with a warrior culture. Work was divided by sex, with certain tasks performed exclusively by men and others exclusively by women. Social conformity was achieved, and misbehavior curbed, by a process of public shaming. The Blackfeet had contacts with the Spanish in New Mexico, from whom they acquired horses, and with the British in Canada, with whom they traded furs. Their first contact with Americans occurred in 1805 or 1806, when they met members of the Lewis and Clark survey expedition. After this, the Americans tended to align with the Crow Tribe, enemies of the Blackfeet, while the Blackfeet were aligned with the British. Around 1832, however, the Americans took over the fur trade and the Blackfeet's contact with Canada dwindled. From this time, disease and alcohol began to plague the Blackfeet and reduced their population.

In 1855, the Blackfeet's territory was defined by treaty with the United States, but the discovery of gold in Montana in 1862 caused an increase in the non-Indian population, resulting in invasion of and encroachments on the Blackfeet's treaty lands. The Blackfeet resisted this encroachment, but their resistance largely ended in December 1869 when a group of soldiers attacked and massacred a peaceful encampment of Blackfeet under Chief

Heavy Runner, mistaking them for a different group, under Mountain Chief, that had engaged in armed resistance. Joe Kipp, whose mother was a Native American, was a scout who assisted the soldiers during this attack, which is known as the massacre on the Marias River. He attempted to stop the attack when he realized, at the last minute, that the group being attacked was peaceful rather than hostile. After the massacre, in which Chief Heavy Runner was killed, Joe Kipp adopted one of Heavy Runner's sons, who was known both as Night Gun and as Cut Bank John. This adopted son was the grandfather of John Kipp, defendant's father by adoption.

The buffalo had largely disappeared from Blackfeet territory by 1882, and at least 600 Blackfeet died of starvation during the winter of 1882-1883, reducing the tribe's population to around 2,500. Boundaries for the Blackfeet Reservation in Montana were drawn in 1888, but the reservation's size was later reduced. In 1884, the Bureau of Indian Affairs (BIA) adopted regulations to discourage or prohibit Indian customs, ceremonies, and languages, with the intent to thereby accelerate the Indians' assimilation into White society. Indian children were required to attend boarding schools where Indian languages could not be spoken. The BIA encouraged the Blackfeet to farm their land, but the land was generally unsuitable for farming. When agriculture failed, many Blackfeet families sold the land assigned to them to obtain money for subsistence, causing further diminution of tribal lands.

After World War II, the BIA allowed tribes to decide whether alcohol would be sold on their lands, and the Blackfeet decided to allow sales of alcohol on the Blackfeet Reservation. Many Blackfeet who returned to the reservation after the war had acquired drinking habits while serving in the military or working in war-related industries. From this time, alcoholism became an increasingly serious problem on the reservation. At the time of trial in 1989, 6,000 Blackfeet lived on the reservation in Montana, with an unemployment rate of 60 to 70 percent and annual family income of around $5,000 per year, compared to $18,000 per year for Montana generally.

According to defendant's witnesses, Blackfeet and other Native Americans who leave their reservations often experience low self-esteem and lose the support of their communities. They may lack internal controls on their behavior. For this reason, Indians who experience problems after leaving the reservation may quickly fall apart.

Defendant was born on the Blackfeet Reservation in 1958. His birth mother was Mary Still Smoking, also known as Baby Girl Sherman or Sister Girl, who was an alcoholic and also "nervous" and "paranoid." She was "out drinking most of the time." Defendant's birth father was Curly Carpenter. At

first, defendant lived in the home of his maternal grandmother, Mary Still Smoking, known as Old Mary. Around 12 to 14 children lived in a two-room house. Inebriation and fighting were common in the house, which was filthy, and the children living there were neglected. According to Haney, the psychologist who testified as a defense expert, this experience of neglect would tend to cause defendant to view the world as an insecure and threatening place, and it would cause him to develop a basic distrust and fear of people and a great sensitivity to rejection or abandonment.

Defendant was 23 months old in January 1960 when child welfare workers removed him from his grandmother's home and placed him with John and Mildred Kipp, who were also members of the Blackfeet Tribe. Mildred Kipp, also known as Bobbie, had two daughters, Murna and Margie, who were not John's children and who at this time were grown and living in Chicago.

John Kipp was very large (his height was estimated at three to six inches over six feet, and his weight at 240 to 290 pounds), handsome and muscular. John was the leader of his family and ran the family ranch on Cut Bank Creek within the reservation. Because they lived on the ranch, John and Bobbie were somewhat isolated from the rest of the Blackfeet community. During World War II, John had served in the United States Marine Corps and was decorated for saving a wounded Japanese soldier by carrying him to medical aid. He was an excellent hunter, fisher, and trapper. He was demanding, a perfectionist, always wanting things done his way.

When he was placed with the Kipps, defendant was small and appeared malnourished. His hair had been shaved off and he had impetigo (a skin disease) and lice. At first, John Kipp seemed unwilling to accept defendant into his family, referring to him as "Bobbie's foster kid," but after about six months his attitude changed and he began to treat defendant as his son.

As a young child, defendant followed Bobbie everywhere and cried if he was separated from her. Defendant attended primary school in Cut Bank, a town just outside the reservation boundary. If the weather was bad, or if John and Mildred were busy taking care of their crops, defendant would stay in Cut Bank with Fron and Dorothy Froman, who were friends of John and Mildred Kipp.

During his boyhood and teenage years, defendant was a good worker. He idolized John and tried to live up to John's expectations, although he was never able to do so because of John's perfectionism. Defendant and John went hunting and fishing together, and John taught defendant to operate all the farm tractors. According to defense expert Haney, John did not give

defendant the freedom needed for development of internal controls, and defendant had difficulty distinguishing his own wants and values from John's wants and values.

John organized or joined a boxing club and trained defendant in boxing. At this time, defendant was "friendly and well mannered," honest and a hard worker. Defendant went to high school in Browning, Montana, on the Blackfeet Reservation. In high school, he was a gentle person who was shy with girls. He was "a warm, loving, and respectful young man." Defendant competed in cross-country, and his coach described him as then being courteous, trustworthy, and "an all-around good kid to coach."

In 1973, Billy Kipp, son of Max Kipp, the younger brother of John Kipp, died in an automobile accident on the reservation. Defendant (who was then 15) and Billy (then 11) were passengers in a car driven by Jimmy Kipp, Billy's older brother, when the car went out of control, hit an embankment, and turned over. Billy was thrown from the car and died. Defendant was hospitalized for an injury to his leg. John had sent the boys to get some seed grain, and he felt somehow responsible. He begged his brother Max to sue him, but Max refused. Because of his large size and easy disposition, Billy had been a particular favorite of John's, and John had invited him to stay at the ranch. After the accident, John began to drink whiskey excessively and suffered a stroke.

When John lost control of his drinking, his relations with other members of his family suffered. He became estranged from his brother Max after Max confronted him about his abuse of alcohol. His marriage to Bobbie broke down. He physically abused both Bobbie and defendant. He broke two of Bobbie's fingers when he jerked a door shut on her hand. He spent more time away from the ranch, much of it in bars, and became involved with another woman. He became aggressive and rough, and even old friends avoided him. Eventually Bobbie moved away from the ranch and divorced John, who then remarried.

According to psychologist Haney, John had provided defendant with his sense of identity, and John's deterioration was profoundly frightening to defendant, who was in a constant state of emotional turmoil. The fears and insecurities from his first two years of life returned, and he began to doubt that John's way of living was the right way. Defendant became discouraged and "lost heart." He gave up boxing and lacked a sense of direction.

Defendant went to Spokane, Washington, to live with Max Kipp, John Kipp's brother, during the fall of defendant's senior year in high school. He

was there in 1977 when, at the age of 19, he received news that John had died. During the previous year, defendant had taken charge of operating the ranch, but he was working as a bricklayer in Spokane when he received the news of John's death. Defendant left immediately and drove all night to return to the ranch. After John's death, there was a dispute over ownership of the ranch between the Kipp family and John's widow. Defendant was in the middle of this conflict and unprepared to deal with it. In the end, Bobbie got nothing, while defendant received $13,000.

Defendant enlisted in the United States Marine Corps. Because of the discipline and the high standards and expectations, being in the Marines was similar to defendant's previous experience as John's son. A defense witness testified that the percentage of American Indians who have served in the military is about twice that for the population as a whole. Among the Plains tribes, with a warrior tradition, combat experience is highly valued and members of these tribes tend to join elite combat units like the Marines and the Rangers. Those who join the military but do not have combat experience tend to feel shame and dissatisfaction.

Defendant was considered an outstanding recruit during boot camp, but then he was assigned to a desk job in Okinawa. According to defense expert Haney, once the challenge was gone, defendant was disappointed and unprepared for office work on a military base in a foreign country. He developed an attitude problem, stole some items, spent time in the brig, and began to abuse alcohol, cocaine, and methamphetamine. Defendant was transferred to California, where he raped June M. in June 1981. After the rape, defendant left his military post without leave and went back to the Blackfeet Reservation in Montana. There, in July 1981, defendant dated Coleen Cooper, who described him as a "gentleman" who was "really good to her."

Defendant was arrested for the rape of June M. in August 1981. While in custody in the Los Angeles County jail awaiting trial, he was sexually assaulted by other inmates. According to defense expert Haney, the experience was profoundly frightening, and defendant learned not to show any weakness or vulnerability to other inmates. Bobbie visited defendant at the state prison in Susanville, where defendant adjusted well. After his release from prison in 1983, defendant continued to deteriorate because he had no sense of direction or identity, and no one with whom he felt able to discuss his feelings and problems. He was abusing alcohol, cocaine, and methamphetamine. A psychopharmacologist testified that chronic use of either cocaine or methamphetamine can result in paranoia and that this effect is associated with violence and suicide.

Psychologist Haney interviewed defendant five times between 1984 and 1989, when Haney testified. Defendant admitted killing Tiffany Frizzell and

Antaya Howard, and he expressed shame, sorrow, and regret for his actions. Defendant told Haney that when he wrote the September 15 letter to his wife that the prosecution introduced at the guilt phase, in which he denied any remorse for the murders, he was very upset and angry about what had occurred during the Orange County trial for the murder of Antaya Howard.

Many of the witnesses, defendant's friends and relatives, expressed their love for defendant and urged the jury to spare his life.

A professor of sociology testified about the California prison system. Persons sentenced to life imprisonment without possibility of parole are assigned to closed custody prisons, where prisoners spend the whole day confined in a small area known as a module. In these modules, no more than 20 or 30 prisoners are ever together. Surveillance is constant and escape virtually impossible. In segregated housing units, prisoners are allowed to leave their cells only three to four hours per week. Individuals sentenced to life terms tend to be model prisoners, particularly after the age of 40.

F. *Penalty Phase Rebuttal*

In rebuttal, the prosecution presented evidence that on September 9, 1987, a sheriff's deputy at the Orange County jail read and copied a letter that defendant had written to his wife, Linda Kipp, who was then also in custody. This occurred about one week before jail authorities intercepted the September 15 letter from defendant to his wife that the prosecution introduced at the guilt phase. In this earlier letter (hereafter September 9 letter), defendant expressed a desire to rape, sodomize, and gouge the eyes out of every woman deputy serving as a guard at the jail. He said that if he escaped he would associate with a terrorist group and "really go on a spree," and that he would kill every district attorney and their families. He also said that he no longer believed in God and that Satan had helped him rejuvenate his energies.

ISSUES RELATING TO GUILT

I.[2] *Admission of the September 15 Letter*

■ At the outset of the guilt phase of the trial, the defense objected to admission in evidence of any part of the September 15 letter defendant wrote and sent to his wife, Linda Kipp, containing defendant's admissions that he had "raped" and "killed" both Tiffany Frizzell and Antaya Howard. The defense argued that the September 15 letter was inadmissible under Evidence Code section 352 because its probative value was substantially outweighed by the probability that its admission would create a substantial

---

[2]For the parties' convenience, the issues are numbered as in the appellant's opening brief.

danger of undue prejudice. The trial court overruled the objection under Evidence Code section 352, stating that "the letter will be admitted in some form."

The prosecutor proposed to have a deputy sheriff testify that jail authorities in Orange County had intercepted the September 15 letter from defendant to his wife, and to have this deputy then read only an edited portion of one page, including the admission that defendant had raped and killed Frizzell, without giving the jury access to the actual letter. Defense counsel noted that the prosecutor had announced his intention to introduce the entire letter at the penalty phase, adding that for tactical reasons the defense preferred to introduce at the guilt phase every part of the September 15 letter that would eventually be admissible for guilt or penalty. Defense counsel explained that the additional parts of the letter were necessary at the guilt phase to explain the context in which defendant had made the statements and to reduce the letter's impact at the penalty phase. Defense counsel suggested deleting only certain racial epithets, references to "Satan," and derogatory references to female deputies working at the jail. The trial court agreed to delete the racial epithets and the derogatory references to female deputies, but the court ruled that the references to "Satan" would be admissible at the penalty phase and therefore would not be deleted if the defense insisted that every part of the letter admissible at the penalty phase be received in evidence at the guilt phase. As so redacted, the September 15 letter was received in evidence.

■ We apply the deferential abuse of discretion standard when reviewing a trial court's ruling under Evidence Code section 352. (*People v. Cudjo* (1993) 6 Cal.4th 585, 609 [25 Cal.Rptr.2d 390, 863 P.2d 635].) ■ Defendant's admission in the letter that he had raped and killed Tiffany Frizzell had substantial probative value and was not unduly prejudicial within the meaning of Evidence Code section 352. ■ For this purpose, "prejudicial" is not synonymous with "damaging," but refers instead to evidence that " 'uniquely tends to evoke an emotional bias against defendant' " without regard to its relevance on material issues. (*People v. Bolin* (1998) 18 Cal.4th 297, 320 [75 Cal.Rptr.2d 412, 956 P.2d 374]; see also *People v. Edelbacher* (1989) 47 Cal.3d 983, 1016 [254 Cal.Rptr. 586, 766 P.2d 1].)

■ Defendant's spontaneous, uncoerced admission to his wife that he had raped and killed Tiffany Frizzell was highly probative on the material disputed issue of his identity as the perpetrator of the charged offenses of rape and murder. Defendant fails to persuade us that this probative value was greatly diminished by the timing of the admission, coming around three weeks after a jury had returned a penalty verdict of death against defendant

for the murder of Antaya Howard, and three days before the sentencing hearing for that crime. Although defendant may well have been angry, frustrated, and discouraged at that time, defendant does not plausibly explain why any of these emotions would cause him to falsely admit culpability for crimes he had not committed. Nor do we agree that the probative value of the admissions was substantially weakened by defendant's statements in the same letter that he had sodomized both Frizzell and Howard. Although the prosecution's evidence did not establish that either victim had been sodomized, neither did the evidence eliminate that possibility. Moreover, even if we assume that defendant did not sodomize either victim, defendant's false statements to the contrary could be attributed to exaggeration or embellishment without substantially detracting from defendant's admission that he, and not someone else, sexually assaulted and killed the two victims.

The trial court could reasonably determine that the probative value of the admissions was not substantially outweighed by the danger of undue prejudice. Both the prosecutor and the trial court indicated a willingness to redact the letter to remove material that was irrelevant and prejudicial (in the sense of being likely to evoke an emotional bias against defendant unrelated to its relevance on material issues), but the defense insisted that the entire letter be admitted with only a few deletions. Although defendant now objects to a highly vulgar reference to the victim, at trial the defense never suggested deletion of this reference. The trial court agreed to each of the specific deletions the defense requested at the *guilt phase*, although it ruled that the letter's various references to Satan would be admissible at the *penalty phase*. We consider below, as a penalty phase issue, defendant's separate claim that the trial court erred in overruling the objections to the references to Satan for purposes of the penalty phase. We conclude that the trial court did not abuse its discretion under Evidence Code section 352 in denying the defense motion to exclude the September 15 letter in its entirety.

Although defendant contends that the ruling denied him various rights under the state and federal Constitutions, he did not object on these grounds in the trial court, and thus he has not preserved these constitutional claims for appellate review. (*People v. Earp* (1999) 20 Cal.4th 826, 878 [85 Cal.Rptr.2d 857, 978 P.2d 15].)

We reject also defendant's related contention that his trial counsel, by failing to base the objection on constitutional as well as statutory grounds, denied him his constitutional right to the effective assistance of counsel. To establish a violation of the constitutional right to effective assistance of counsel, a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent

attorney and that this deficient performance caused prejudice in the sense that it "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." (*Strickland v. Washington* (1984) 466 U.S. 668, 686 [104 S.Ct. 2052, 2064, 80 L.Ed.2d 674]; see also *People v. Wader* (1993) 5 Cal.4th 610, 636 [20 Cal.Rptr.2d 788, 854 P.2d 80].) If a defendant has failed to show that the challenged actions of counsel were prejudicial, a reviewing court may reject the claim on that ground without determining whether counsel's performance was deficient. (*Strickland v. Washington, supra,* 466 U.S. at p. 697 [104 S.Ct. at p. 2064].)

■ Here, defendant fails to establish either deficient performance or prejudice from counsel's failure to cite constitutional grounds when objecting to the September 15 letter. Defendant does not argue here that there are constitutional standards of admissibility more exacting than the statutory standards imposed by the Evidence Code. Because, as we have concluded, the September 15 letter satisfied applicable statutory admission standards, adding constitutional grounds to the objection would not have altered the trial court's ruling or our conclusion on review that the ruling was correct. Accordingly, defendant was not denied his right to effective assistance of counsel by counsel's failure to cite constitutional grounds in making his objection.

## II. *Evidence of Why Tiffany Frizzell Was in Long Beach*

■ The defense objected at the guilt phase of trial to evidence that Tiffany Frizzell was in Long Beach to attend Brooks College, arguing that the purpose of her presence in Long Beach was irrelevant to any material issue. The prosecution argued that the evidence was relevant on the rape charge to establish that Tiffany Frizzell did not consent to sexual intercourse with defendant. The trial court overruled the objection but cautioned the prosecutor not to "go into great detail on it." Joan Frizzell, Tiffany's mother, then testified that Tiffany's purpose in traveling to Long Beach was to attend college.

■ We apply the deferential abuse of discretion standard when reviewing a trial court's ruling on a relevance objection. (*People v. Waidla* (2000) 22 Cal.4th 690, 717-718 [94 Cal.Rptr.2d 396, 996 P.2d 46]; *People v. Sanders* (1995) 11 Cal.4th 475, 554-555 [46 Cal.Rptr.2d 751, 905 P.2d 420].) ■ We discern no abuse of discretion here. ■ "Evidence is relevant if it has *any* tendency in reason to prove or disprove a disputed fact at issue." (*People v. Mayfield* (1997) 14 Cal.4th 668, 749 [60 Cal.Rptr.2d 1, 928 P.2d 485]; see Evid. Code, § 210.) ■ In a prosecution for forcible

rape, evidence is relevant if it establishes any circumstance making the victim's consent to sexual intercourse less plausible. (See, e.g., *People v. Rowland* (1992) 4 Cal.4th 238, 264 [14 Cal.Rptr.2d 377, 841 ·P.2d 897] [evidence that victim had a "terrible headache" and had to get to work early the next morning was "clearly probative of rape"].) In determining whether Tiffany Frizzell had consented to intercourse with defendant, with whom she had no prior acquaintance, the jury might be assisted by the information that she was not traveling on a holiday or vacation, but had arrived to begin her college education. This information also prevented any speculation by the jury that a young woman alone in a motel room might be a prostitute who consented to intercourse with defendant on a promise of compensation. Although the probative value of the evidence was not great, we cannot say that it lacked any tendency in reason to prove that Frizzell did not consent to sexual intercourse with defendant.

◼ Defendant also contends the trial court should have excluded the evidence of the reason for Tiffany Frizzell's presence in Long Beach under Evidence Code section 352 because the probative value of this evidence was substantially outweighed by the probability that its admission would create a substantial danger of undue prejudice. Because the defense did not object on this ground at trial, the issue is not preserved for appellate review. (Evid. Code, § 353, subd. (a).) Although defense counsel made two isolated references to the evidence being "inflammatory," counsel neither mentioned Evidence Code section 352 nor argued that the probative value of the evidence was substantially outweighed by a risk of undue prejudice. Instead, counsel argued consistently and exclusively that the evidence was entirely irrelevant and immaterial. This was insufficient to preserve a claim of error under Evidence Code section 352. (See *People v. Barnett* (1998) 17 Cal.4th 1044, 1130 [74 Cal.Rptr.2d 121, 954 P.2d 384]; *People v. Champion* (1995) 9 Cal.4th 879, 913 [39 Cal.Rptr.2d 547, 891 P.2d 93]; *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1014-1015 [30 Cal.Rptr.2d 818, 874 P.2d 248].)·

◼ Were the claim preserved for our review, we would reject it on the merits. Although the probative value of the evidence was relatively slight, this probative value was not substantially outweighed by the risk of undue prejudice. The testimony about Tiffany Frizzell's purpose in traveling to Long Beach to attend college was brief and apparently without any display of emotion. The trial court could reasonably conclude, in the exercise of its broad discretion, that this testimony would not so inflame the jurors' emotions as to interfere with their fair and dispassionate assessment of the ·evidence of defendant's guilt.

Defendant argues that admission of the testimony that Tiffany Frizzell was in Long Beach to begin her college studies denied him various rights

under the state and federal Constitutions, but he did not object on these grounds in the trial court, and thus these constitutional issues are not preserved for appellate review. (*People v. Earp, supra,* 20 Cal.4th at p. 878.)

We reject also defendant's related contention that his trial counsel, by failing to base his objection on constitutional grounds, denied him his constitutional right to the effective assistance of counsel. Defendant does not argue here that there are constitutional standards of admissibility more exacting than the statutory standards imposed by the Evidence Code. Because the evidence satisfied applicable statutory admission standards, an objection on constitutional grounds would have lacked merit. Accordingly, defendant was not denied his right to effective assistance of counsel by counsel's failure to cite constitutional grounds in making his objection.

III. *Evidence and Instruction Concerning Escape Attempts*

At the guilt phase, the defense requested an offer of proof from the prosecution on evidence of defendant's attempted escape from the Los Angeles County jail. After the prosecutor described the testimony he proposed to introduce on this incident, the defense objected to the proposed evidence, citing Evidence Code section 352 and objecting with particular vehemence to evidence of any statements defendant had made. The trial court ruled that the prosecution could introduce defendant's statement that he would have been gone by morning if the deputies had not stopped him, but the trial court ruled inadmissible at the guilt phase any statements by defendant threatening harm to the deputies. Otherwise, the trial court overruled the defense objection to evidence of the attempted escape. The trial court instructed the jury that an attempted escape, although not sufficient to establish guilt, could be considered in deciding the question of guilt or innocence.

■ Defendant contends that the trial court erred in admitting evidence of the attempted escape from the Los Angeles County jail, that the trial court should also have excluded evidence of defendant's planning for an escape from the Orange County jail, and that the trial court should not have instructed the jury it could consider escape attempts in deciding his guilt or innocence. Recognizing that the defense did not object at trial to evidence of the Orange County jail incident, defendant contends that his trial counsel rendered constitutionally ineffective assistance by failing to make this objection.

We apply the deferential abuse of discretion standard when reviewing a trial court's ruling under Evidence Code section 352. (*People v. Cudjo,*

*supra,* 6 Cal.4th at p. 609.) Applying that standard, we discern no abuse of discretion in the trial court's guilt phase ruling allowing evidence of the Los Angeles County jail escape attempt but excluding evidence of defendant's accompanying threats against jail personnel.

Defendant concedes that ordinarily an attempt or plan to escape from jail pending trial is relevant to establish consciousness of guilt (*People v. Morris* (1991) 53 Cal.3d 152, 196 [279 Cal.Rptr. 720, 807 P.2d 949], disapproved on another ground in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1 [38 Cal.Rptr.2d 394, 889 P.2d 588]; *People v. Terry* (1970) 2 Cal.3d 362, 395 [85 Cal.Rptr. 409, 466 P.2d 961]), but he argues that any such relevance is diminished here to the point of insignificance because at the time of the attempted escape defendant was under a judgment of death for the Orange County murder of Antaya Howard, and so his desire to escape execution for that crime provided a complete and powerful motive for the escape attempt, quite apart from any consciousness of guilt on the capital charge for the murder of Tiffany Frizzell. We agree that the existing death judgment diminished the probative value of the attempted escape as evidence of consciousness of guilt on the charges at issue here, but we do not agree that the probative value was so diminished as to lack any practical significance. Defendant was not facing imminent execution. Rather, as defendant surely knew, his automatic appeal, petitions for habeas corpus in the state and federal courts, and application for executive clemency would prevent execution for a period of years and afforded defendant some reason to hope that the execution would never occur. In this situation, defendant's decision to attempt an escape might well have been significantly influenced by consciousness that he was guilty of the charged capital murder of Tiffany Frizzell and would likely incur a second death judgment.

Balanced against this probative value, the risk of undue prejudice was slight. Apart from a brief resistance when defendant reentered his cell, the escape attempt involved no overt violence. The trial court could reasonably conclude, in the exercise of its broad discretion, that this evidence would not so inflame the jurors' emotions as to interfere with their fair and dispassionate assessment of the evidence of defendant's guilt. The trial court did not abuse its discretion in admitting the evidence or in instructing the jury that it could consider this evidence as one factor in deciding defendant's guilt or innocence of the charged offenses.

Defense counsel's failure to object to evidence of defendant's earlier planning efforts for an escape from the Orange County jail does not establish ineffective assistance of counsel, because defendant fails to establish prejudice. Had counsel objected under Evidence Code section 352, the trial court

could have overruled the objection, reasonably concluding, in the exercise of its broad discretion, that this evidence, like the evidence of the attempted escape from the Los Angeles County jail, had significant probative value and would not so inflame the jurors' emotions as to interfere with their fair and dispassionate assessment of the evidence of defendant's guilt. This escape never got beyond the planning stage, and the plans did not include any acts of violence. Thus, this evidence had even less potential to inflame the jurors' emotions than the evidence of the attempted escape from the Los Angeles County jail.

Moreover, even if we assume the trial court would have exercised its discretion under Evidence Code section 352 to exclude evidence of the escape attempt at the guilt phase, it is not reasonably probable that the jury would have returned guilt verdicts more favorable to defendant. The evidence of defendant's guilt included his own admissions that he raped and killed Tiffany Frizzell, the presence of his fingerprint in her motel room and on her book inside the bag discarded in an alley, and his possession and sale of Frizzell's personal stereo and cassette player. Given the strength of the prosecution's case, and the absence of any affirmative defense evidence of innocence, the jury's knowledge of the escape would not have contributed in any significant way to the guilt verdicts.

Defendant argues that counsel should at least have moved to exclude references to the planned participation of Linda Kipp's son in the escape attempt because evidence that defendant intended to involve a child was particularly inflammatory. We do not agree that counsel's failure to so move establishes a violation of the constitutional right to the effective assistance of counsel. Having reviewed the trial evidence and the prosecutor's argument on this point, we find nothing to indicate to the jury that Linda Kipp's son was a minor rather than an adult. Because the jury was never told that Linda Kipp's son was not an adult, and because there was no evidence that he was even aware of the planned escape, much less participated in the planning, there was no sound basis for a motion to exclude reference to his planned participation in the escape attempt, and trial counsel's performance was not deficient by reason of their failure to make this groundless motion.

Defendant's claimed instructional error is contingent on his claim of error in admission of the evidence of the attempted escapes. In other words, he argues only that if the trial court had excluded the attempted escape evidence, the instruction concerning the jury's consideration of that evidence would not have been proper. Because we have found no error in the admission of the evidence, we reject the related claim of instruction error. The instruction correctly states the law. (See *People v. Carrera* (1989) 49

Cal.3d 291, 313-314 [261 Cal.Rptr. 348, 777 P.2d 121]; *People v. Williams* (1988) 44 Cal.3d 1127, 1144-1145 [245 Cal.Rptr. 635, 751 P.2d 901].)

IV. *Sufficiency of the Evidence of Robbery*

Defendant contends the evidence at trial was insufficient to support the verdict finding him guilty of robbery. In particular, he argues that there was no substantial evidence that he formed the intent to steal before or during, rather than after, he applied force to the victim, Tiffany Frizzell. He also argues that this deficiency requires reversal of his first degree murder conviction, because felony murder in the commission of a robbery was one of the theories under which the charge of murder was submitted to the jury.

To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Marshall* (1997) 15 Cal.4th 1, 34 [61 Cal.Rptr.2d 84, 931 P.2d 262]; *People v. Wader, supra,* 5 Cal.4th at p. 640.)

"To support a robbery conviction, the evidence must show that the requisite intent to steal arose either before or during the commission of the act of force." (*People v. Marshall, supra,* 15 Cal.4th at p. 34.) Here, we are satisfied that a rational trier of fact could have found beyond a reasonable doubt that defendant intended to steal from Tiffany Frizzell when he strangled her to death. We have explained that when presented with evidence that a defendant killed another and took substantial property from the victim at the time of the killing, a jury ordinarily may reasonably infer that the defendant killed for the purpose of robbery. (*People v. Turner* (1990) 50 Cal.3d 668, 688 [268 Cal.Rptr. 706, 789 P.2d 887].) We have recognized that a jury may reasonably draw this inference when the evidence shows that the defendant also raped or attempted to rape the victim at the time of the killing. (*People v. Kelly* (1992) 1 Cal.4th 495, 529 [3 Cal.Rptr.2d 677, 822 P.2d 385].) In that situation, a jury may infer that the defendant killed for purposes of both rape and robbery. (*Ibid.*)

Here, there was evidence that when defendant strangled Tiffany Frizzell, he took her personal stereo and her cassette player, both of which he later sold to a secondhand goods dealer for $70. From this evidence, the jury could reasonably infer that at least one reason defendant killed Frizzell was to accomplish the taking of these items.

We are unpersuaded by defendant's argument that this inference is unreasonable in light of defendant's failure to take other property of value from

the victim, including $130 in cash found in a dresser in her motel room. The relatively undisturbed condition of the bed on which the victim's body was found, and the absence of any indication of a struggle having taken place in the room suggests that defendant killed the victim elsewhere. (See *People v. Kipp, supra,* 18 Cal.4th at p. 370.) When defendant returned the victim's body to her motel room, he evidently did not search the room, perhaps because he feared detection and was in a hurry, or perhaps because he did not suspect that it contained anything of value. Defendant's failure to search the motel room for additional property to steal after he had killed Frizzell at another location does not establish that he lacked the intent to steal when he killed her.

We note in addition that even were we to conclude that the evidence is insufficient to support the robbery charge, this conclusion would not affect the validity of the first degree murder conviction. Because the jury found true the special circumstance allegation that defendant killed Frizzell during the commission of rape (while being unable to reach a verdict on the special circumstance allegation of murder during the commission of robbery), we may be confident that the jury rested its first degree murder verdict on the theory of felony murder in the commission of rape, and not on the theory of felony murder during the commission of robbery. (See *People v. Marshall, supra,* 15 Cal.4th at pp. 37-38; *People v. Kelly, supra,* 1 Cal.4th at p. 531.)

Defendant claims that his conviction of robbery on insufficient evidence violated his rights under the state and federal Constitutions to due process, to present a defense, and to a reliable verdict. Having concluded that the evidence of robbery is sufficient, we reject these derivative constitutional claims.

## V. *Prosecutorial Misconduct in Argument*

During closing argument for the guilt phase, the prosecutor said: "So when you think about the elements of the offense of murder, as you will when you go back to deliberate, and as we, perhaps in somewhat of a legal abstract sense, the element satisfied a human being was killed. [¶] If you would, think for a moment about what it means. A living, breathing human being had all of that taken away."

Defense counsel promptly objected and, at the bench, stated that the argument was "an appeal to sympathy." The prosecutor replied that the jury should understand that murder is "a grim business" but also that he was "done with that part of [his] argument" and would move on to another point. The trial court said the prosecutor "would be well advised to do that," adding

that the court had been "a little concerned" about the direction of the prosecutor's argument and noting that the jury would be instructed not to be guided by passion or sympathy. The prosecutor then resumed the argument by addressing a different point.

"[A]n appeal for sympathy for the victim is out of place during an objective determination of guilt." (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1057 [17 Cal.Rptr.2d 174, 846 P.2d 756], revd. on other grounds *sub nom. Stansbury v. California* (1994) 511 U.S. 318 [114 S.Ct. 1526, 128 L.Ed.2d 293]; accord, *People v. Arias* (1996) 13 Cal.4th 92, 160 [51 Cal.Rptr.2d 770, 913 P.2d 980]; *People v. Pensinger* (1991) 52 Cal.3d 1210, 1250 [278 Cal.Rptr. 640, 805 P.2d 899]; *People v. Fields* (1983) 35 Cal.3d 329, 362 [197 Cal.Rptr. 803, 673 P.2d 680].) The prosecutor's argument, inviting the jury to reflect on all that the victim had lost through her death, was an appeal for sympathy for the victim, and therefore it was improper at the guilt phase of this capital trial.

"To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct." (*People v. Price* (1991) 1 Cal.4th 324, 447 [3 Cal.Rptr.2d 106, 821 P.2d 610].) Here, the defense made a timely objection to the prosecutor's improper argument but did not request an admonition. Because the trial court indicated that the jury would be instructed "not to be guided by passion or sympathy," the defense may have concluded that the instruction would function as an admonition.

In any event, reversal is not required. The prosecutor's comment was brief, mild, and not repeated. It did not "add cumulative impact to other errors in a crucial area of the case." (*People v. Pensinger, supra,* 52 Cal.3d at p. 1250.) The evidence that defendant raped and killed Tiffany Frizzell was very strong and generally uncontradicted. It is not reasonably probable that the jury would have reached a result more favorable to defendant absent the prosecutor's misconduct. (See *People v. Fields, supra,* 35 Cal.3d at p. 363.)

Defendant claims that the prosecutor's misconduct deprived him of his rights under the federal and state Constitutions to due process, equal protection, an impartial jury, and reliable guilt and penalty verdicts. Because he did not object on these grounds in the trial court, the constitutional claims are not preserved for appellate review. (*People v. Earp, supra,* 20 Cal.4th at p. 878.) In any event, the prosecutor's comment did not infect the trial with such unfairness as to make defendant's conviction a denial of due process (see *Darden v. Wainwright* (1986) 477 U.S. 168, 181 [106 S.Ct. 2464, 2471-2472, 91 L.Ed.2d 144]) or to render the verdicts unreliable.

## VI. *Felony-murder Instruction*

Defendant contends that the trial court erred in instructing the jury on felony murder when the information charged only murder with malice. We disagree.

The information charged defendant with murder in these terms: "The said MARTIN JAMES KIPP is accused . . . of the crime of MURDER, in violation of Section 187, of the California Penal Code, a felony, committed as follows: That the said MARTIN JAMES KIPP . . . did willfully, unlawfully, and with malice aforethought murder Tiffany Frizzell, a human being."

A pleading charging murder in these terms adequately notifies a defendant of the possibility of conviction of first degree murder on a felony-murder theory. (*People v. Gallego* (1990) 52 Cal.3d 115, 188 [276 Cal.Rptr. 679, 802 P.2d 169].) Defendant mistakenly relies on a statement in the plurality opinion in *People v. Dillon* (1983) 34 Cal.3d 441 [194 Cal.Rptr. 390, 668 P.2d 697] that the "two kinds of murder"—that is, felony murder and murder with express or implied malice—"are not the 'same' crimes." (*Id.* at p. 476, fn. 23 (plur. opn. of Mosk, J.).) As we have since explained, however, this means only that the two forms of murder have different elements even though there is but a single statutory offense of murder. (*People v. Carpenter* (1997) 15 Cal.4th 312, 394-395 [63 Cal.Rptr.2d 1, 935 P.2d 708]; *People v. Pride* (1992) 3 Cal.4th 195, 249 [10 Cal.Rptr.2d 636, 833 P.2d 643].) "Felony murder and premeditated murder are not distinct crimes . . . ." (*People v. Davis* (1995) 10 Cal.4th 463, 514 [41 Cal.Rptr.2d 826, 896 P.2d 119].)

Because of the different forms or varieties of murder, we have acknowledged that an information charging murder without elaboration may not always provide notice sufficient to afford the due process of law guaranteed by the Fourteenth Amendment to the federal Constitution. (*People v. Gallego, supra,* 52 Cal.3d at p. 189; *People v. Murtishaw* (1981) 29 Cal.3d 733, 751, fn. 11 [175 Cal.Rptr. 738, 631 P.2d 446].) Here, however, defendant may not complain of inadequate notice. The information charged defendant with rape and robbery, as well as murder, and it alleged the special circumstances of murder in the commission of rape and robbery. The prosecution introduced evidence supporting each crime charged and each special circumstance allegation. The defense made no request for a continuance on the basis of inadequate notice, "[n]or has defendant persuasively explained how the defense strategy was significantly affected by the addition of the felony-murder rape theory." (*People v. Davis, supra,* 10 Cal.4th at p. 513.) In any event, defendant waived any claim of insufficient notice by not moving to

reopen when he learned that the court would instruct the jury on felony murder. (*People v. Memro* (1995) 11 Cal.4th 786, 869 [47 Cal.Rptr.2d 219, 905 P.2d 1305].)

We have previously rejected defendant's contention that the jury must unanimously agree on a theory of first degree murder as either felony murder or murder with premeditation and deliberation. (*People v. Riel* (2000) 22 Cal.4th 1153, 1200 [96 Cal.Rptr.2d 1, 998 P.2d 969]; *People v. Millwee* (1998) 18 Cal.4th 96, 160-161 [74 Cal.Rptr.2d 418, 954 P.2d 990].)

## VII. *Cumulative Effect of Asserted Guilt Phase Errors*

Defendant argues that even if no single error requires reversal of the jury verdicts and findings returned at the guilt phase, the cumulative effect of guilt phase errors must be deemed sufficiently prejudicial to warrant this remedy. Apart from a single instance of prosecutorial misconduct, which we have found nonprejudicial, defendant has failed to demonstrate that error occurred at the guilt phase. Accordingly, there could be no cumulative effect.

PENALTY PHASE ISSUES

## VIII. *Defendant's September 9 Letter to His Wife*

 As part of its case in rebuttal at the penalty phase, and over defense objection, the prosecutor introduced a redacted copy of the September 9 letter that defendant wrote to his wife, Linda Kipp, and that was intercepted by jail personnel approximately one week before they intercepted the September 15 letter that the prosecutor introduced at the guilt phase. In the September 9 letter, defendant wrote of his desire to rape women deputies and to kill district attorneys and their families. Defendant contends the trial court erred in overruling the defense objection to this evidence, arguing that the probative value of the September 9 letter was overwhelmed by its prejudicial impact on the jury.

We apply the deferential abuse of discretion standard when reviewing a trial court's ruling under Evidence Code section 352. (*People v. Cudjo, supra,* 6 Cal.4th at p. 609.) Applying that standard, we discern no abuse of discretion in the trial court's penalty phase ruling allowing in evidence the September 9 letter. The letter was relevant to rebut defense evidence that defendant committed the two capital murders during a relatively brief period of aberrant behavior, that he had since expressed regret and shame for the murders, and that he was unlikely to commit additional offenses if imprisoned for life. As with the September 15 letter, defendant fails to persuade us

that this probative value was greatly diminished by the timing of the admission, coming a few weeks after a jury had returned a penalty verdict of death against defendant for the murder of Antaya Howard. Although defendant may well have been angry, frustrated, and discouraged at that time, defendant does not plausibly explain why the jury could not properly consider these emotions in deciding the appropriate weight to give the evidence. The evidence was properly admitted in rebuttal. (See *People v. Mitcham* (1992) 1 Cal.4th 1027, 1072-1073 [5 Cal.Rptr.2d 230, 824 P.2d 1277].)

Defendant contends that the trial court's ruling admitting the September 9 letter into evidence denied him various rights under the state and federal Constitutions, but he did not object on these grounds in the trial court, and he does not argue here that there are constitutional standards of admissibility more exacting than the statutory standards imposed by the Evidence Code. Having concluded that the evidence was properly admitted under Evidence Code section 352, we also reject these belated and derivative constitutional claims.

IX. *Evidence of Threat to Sheriff's Sergeant*

During the penalty phase, the defense moved to exclude evidence that defendant threatened to kill a sheriff's sergeant who assisted in subduing him after his attempted escape from the Los Angeles County jail. The defense argued that the threat did not violate any law and thus was not "criminal activity" within the meaning of section 190.3, factor (b). The prosecution argued in reply that the threat was relevant as part of the escape attempt. The trial court denied the motion. Defendant contends the ruling was reversible error.

At the penalty phase, the jury is permitted to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (§ 190.3, factor (b).) As used in this factor, the term "criminal activity" includes only conduct that violates a penal statute. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1169 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People v. Boyd* (1985) 38 Cal.3d 762, 772 [215 Cal.Rptr. 1, 700 P.2d 782].) Here, respondent does not argue that defendant's threat to kill the sheriff's sergeant, by itself, violated a penal statute,[3] but instead that the threat was admissible as part of the attempted escape, which did. We agree.

Under section 190.3, factor (b), the prosecution may introduce evidence to show not only the conduct establishing the criminal violation, but also

---

[3]Section 422, which defines the offense of making criminal threats, took effect on September 26, 1988, some nine months after defendant made the threats at issue here.

evidence of any relevant surrounding circumstances. (*People v. Kirkpatrick, supra,* 7 Cal.4th at pp. 1013-1014; *People v. Ashmus* (1991) 54 Cal.3d 932, 985 [2 Cal.Rptr.2d 112, 820 P.2d 214].) In particular, threats made while in custody immediately after an otherwise admissible violent criminal incident are themselves admissible under factor (b). (*People v. Welch* (1999) 20 Cal.4th 701, 759 [85 Cal.Rptr.2d 203, 976 P.2d 754]; *People v. Montiel* (1993) 5 Cal.4th 877, 916-917 [21 Cal.Rptr.2d 705, 855 P.2d 1277].) Here, defendant's threats against the sheriff's sergeant were relevant to an understanding of the violent potential of defendant's attempted escape.

Defendant contends that the trial court's ruling admitting evidence of these threats denied him various rights under the state and federal Constitutions, but he did not object on these grounds in the trial court, and he does not argue here that there are constitutional standards of admissibility more exacting than the statutory standards imposed by the Evidence Code. Having concluded that the evidence was properly admitted under statutory evidence standards, we also reject these belated and derivative constitutional claims.

## X. *Evidence of Defendant's References to Satan*

Defendant contends the trial court erred in admitting evidence that he regarded Satan as his savior. We disagree.

At the guilt phase, the trial court agreed to delete references to Satan in the September 15 letter, but the court also ruled that these references would be admissible at the penalty phase. (See *ante,* at pp. 1121, 1122.) Defendant contends that this ruling is erroneous because the references to Satan do not tend to establish any circumstance in aggravation. When this issue was discussed in the trial court, the defense argued that the references to Satan were not relevant to any statutory aggravating factor. The prosecutor replied that the defense would place defendant's character in issue at the penalty phase, and that evidence about defendant's favorable regard for Satan would then be admissible in rebuttal. The court ruled it would allow the references to Satan "at the penalty phase under factor k."

Defendant is correct that character evidence under section 190.3, factor (k), can only be mitigating, and therefore the prosecution may not introduce evidence of defendant's bad character as part of its case in aggravation at the penalty phase. (*People v. Boyd, supra,* 38 Cal.3d at pp. 774-775.) Once the defendant puts his general character in issue at the penalty phase, however, the prosecutor may rebut "with evidence or argument suggesting a more balanced picture of his personality." (*People v. Rodriguez* (1986) 42 Cal.3d 730, 791 [230 Cal.Rptr. 667, 726 P.2d 113].) Here, it was understood that

defendant intended to place his general character in issue at the penalty phase, and in this context the trial court's ruling properly permitted the prosecution to respond with rebuttal evidence about defendant's views on Satan.

The prosecution elicited additional evidence about defendant's view of Satan during questioning about defendant's threats in January 1988, immediately after his unsuccessful attempt to escape from the Los Angeles County jail, to kill a sheriff's sergeant who had assisted in subduing him. The witness testified, without defense objection, that defendant "swore . . . to his savior, Satan," that he would kill the sergeant "in a very big way." Absent an objection, the admissibility of this brief reference to Satan is not preserved for appellate review. (Evid. Code, § 353, subd. (a).) In any event, the evidence was admissible as part of the circumstances of the escape attempt and threats. (*People v. Kirkpatrick, supra,* 7 Cal.4th at pp. 1013-1014.)

Defendant's September 9 letter to his wife, admitted at the penalty phase, included two references to Satan, including a statement that "Satan has helped me rejuvanate my energie's in a working way." In objecting to the September 9 letter in its entirety, defense counsel argued that the prosecutor was "seeking to get in some enormous prejudicial evidence about Satan which is [*sic*: has] virtually no probative value."

Assuming that this remark is sufficient to preserve a specific objection under Evidence Code section 352 to the September 9 letter's references to Satan, we conclude that the trial court did not err in overruling the objection. Defendant wrote the September 9 and September 15 letters in 1987, four years after killing Tiffany Frizzell and around 15 months before trial began. Thus, the jury could properly consider these letters as bearing on defendant's claimed feelings of remorse at the time of trial. A favorable view of the biblical figure of Satan is generally understood as a symbolic rejection of the values of love and compassion, and as indicating acceptance of the contrary values of hatred and violence, with a consequent rejection of all moral restrictions on crimes such as murder and rape. (See *McCorkle v. Johnson* (11th Cir. 1989) 881 F.2d 993, 995-996.) This abhorrent value system is inconsistent with defendant's claimed remorse and shame for the murders of his two victims, and thus the evidence was properly admitted in rebuttal. (See *People v. Jones* (1998) 17 Cal.4th 279, 306-307 [70 Cal.Rptr.2d 793, 949 P.2d 890].) If defendant's conception of Satan encompassed qualities consistent with an attitude of remorse, he was free to articulate them.

XI. *Photograph of Antaya Howard's Body*

At the penalty phase, the prosecution sought to introduce in evidence two photographs of Antaya Howard's body as police officers found it

in her car. The prosecutor explained that he was offering one photograph to show the blood on the forearm and the other to show both the position of the clothing on her body and the position of the body in the hatchback area of the car. The defense objected to both photographs under Evidence Code section 352, remarking that the defense was not disputing that defendant had killed Howard. The trial court sustained the objection to the first photograph because "it's pretty grotesque as far as the face" and "the neck is extremely black and bloated." But the court overruled the objection as to the second photograph, remarking that it was a "very close question."

"The admission of photographs of a victim lies within the broad discretion of the trial court when a claim is made that they are unduly gruesome or inflammatory." (*People v. Crittenden* (1994) 9 Cal.4th 83, 133 [36 Cal.Rptr.2d 474, 885 P.2d 887].) On appeal, we apply the deferential abuse of discretion standard when reviewing the trial court's ruling. (*People v. Cudjo, supra,* 6 Cal.4th at p. 609.) Applying that standard here, we find no abuse of the trial court's discretion. By showing the position of the victim's clothing on her body, some of her injuries, and the position of her body as it was folded into the small hatchback area behind the rear seat of the car, the photograph was relevant to assist the jury in assessing the aggravating force of the murder and rape or attempted rape of Antaya Howard. (See *People v. Wader, supra,* 5 Cal.4th at p. 655.) Although the photograph, which we have reviewed, is somewhat gruesome, as murder victim photographs almost invariably are, it is not shocking or inflammatory. The trial court carefully weighed the potential prejudice and excluded another photograph that was more gruesome in its depiction of the victim's face.

Defendant contends that the trial court's ruling admitting the photographs denied him various rights under the state and federal Constitutions, but he did not object on these grounds in the trial court, and he does not argue here that there are constitutional standards of admissibility more exacting than the statutory standards imposed by the Evidence Code. Having concluded that the evidence was properly admitted under statutory evidence standards, we also reject these belated and derivative constitutional claims.

XII. *California Death Eligibility Law*

Defendant contends that California's death penalty law violates the state and federal Constitutions because it fails to adequately narrow the class of death-eligible defendants. We have repeatedly rejected this contention (e.g., *People v. Mendoza* (2000) 24 Cal.4th 130, 191-192 [99 Cal.Rptr.2d 485, 6 P.3d 150]; *People v. Lucero* (2000) 23 Cal.4th 692, 740 [97 Cal.Rptr.2d 871, 3 P.3d 248], and cases cited) and defendant does not persuade us to reconsider our previous rulings on this issue.

Defendant argues in particular that California's death penalty law fails to appropriately narrow the death-eligible class because it gives prosecutors unreviewable discretion in charging special circumstances and electing to seek the death penalty. For reasons we have previously explained, we disagree. (*People v. Earp, supra,* 20 Cal.4th at p. 905; *People v. Carpenter, supra,* 15 Cal.4th at p. 421; *People v. Arias, supra,* 13 Cal.4th at pp. 189-190; *People v. Crittenden, supra,* 9 Cal.4th at p. 152; *People v. Kirkpatrick, supra,* 7 Cal.4th at p. 1024.)

### XIII. *Instructions on Penalty Determination*

Defendant contends that the standard penalty phase jury instructions given in this case did not provide the jury with an adequate framework for resolving the capital sentencing decision. We have rejected each of the arguments defendant makes in support of this contention. In particular, we have held that the trial court need not instruct the jury that there is a "presumption of life" (*People v. Carpenter* (1999) 21 Cal.4th 1016, 1064 [90 Cal.Rptr.2d 607, 988 P.2d 531]; *People v. Arias, supra,* 13 Cal.4th at p. 190); that the prosecution has the burden of persuasion on the issue of penalty (*People v. Kipp, supra,* 18 Cal.4th at p. 381); that the prosecution must prove the existence of particular aggravating circumstances beyond a reasonable doubt (*People v. Box* (2000) 23 Cal.4th 1153, 1216 [99 Cal.Rptr.2d 69, 5 P.3d 130]; *People v. Lucero, supra,* 23 Cal.4th at p. 741); that the jury must be persuaded beyond a reasonable doubt that death is the appropriate penalty (*People v. Bemore* (2000) 22 Cal.4th 809, 859 [94 Cal.Rptr.2d 840, 996 P.2d 1152]; *People v. Kipp, supra,* at p. 381); or that the jurors must unanimously agree on the existence of particular aggravating circumstances (*People v. Kipp, supra,* at p. 381).

### XIV. *Death Selection Process*

Defendant challenges California's sentencing process in capital cases, claiming it "suffers from a wide variety of statutory, procedural and substantive defects." We have previously rejected each of the arguments defendant raises in support of this contention.

The use of section 190.3, factor (a), which permits the jury to consider in aggravation "[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstance found to be true," is not unconstitutionally vague or imprecise, nor does it improperly weight the scales in favor of death. (*People v. Mendoza, supra,* 24 Cal.4th at p. 192; *People v. Jenkins* (2000) 22 Cal.4th 900, 1050-1053 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Hawkins* (1995)

10 Cal.4th 920, 964 [42 Cal.Rptr.2d 636, 897 P.2d 574].) Section 190.3, factor (b), which permits the jury to consider in aggravation "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence," does not violate state or federal constitutional requirements of due process, equal protection, or reliability in death sentencing (*People v. Anderson* (2001) 25 Cal.4th 543, 584 [106 Cal.Rptr.2d 575, 22 P.3d 347]; *People v. Jenkins, supra,* 22 Cal.4th at p. 1054; *People v. Barnett, supra,* 17 Cal.4th at p. 1178), and the standard jury instructions given here provided adequate guidance on the use of this factor (*People v. Seaton* (2001) 26 Cal.4th 598, 687 [110 Cal.Rptr.2d 441, 28 P.3d 175]). Section 190.3, factors (d) (mental or emotional disturbance) and (h) (mental disease or defect, or intoxication), in their use of the word "extreme" and in their limitation to the time of the offense, do not impermissibly restrict the jury's consideration of relevant mitigating circumstances or make the factors impermissibly vague. (*People v. Anderson, supra,* at p. 601; *People v. Riel, supra,* 22 Cal.4th at p. 1225; *People v. Jenkins, supra,* at pp. 1054-1055; *People v. Welch, supra,* 20 Cal.4th at pp. 768-769.)

The trial court is not required to omit inapplicable factors when instructing the jury. (*People v. Riel, supra,* 22 Cal.4th at p. 1225; *People v. Kipp, supra,* 18 Cal.4th at p. 381.) Nor is the court required to instruct on the meaning of a sentence of life imprisonment without possibility of parole. (*People v. Sakarias* (2000) 22 Cal.4th 596, 641 [94 Cal.Rptr.2d 17, 995 P.2d 152]; *People v. Holt* (1997) 15 Cal.4th 619, 688-689 [63 Cal.Rptr.2d 782, 937 P.2d 213].)

The trial court instructed the jury in these terms: "To return a judgment of death, each of you must be persuaded that the aggravating factors are so substantial in comparison with the mitigating factors that it warrants death instead of life without parole." When the jury is instructed in this way, the trial court need not also instruct the jury to return a verdict of life without parole if the aggravating circumstances do not outweigh the mitigating circumstances. (*People v. Kipp, supra,* 18 Cal.4th at p. 381.)

Defendant contends the jury instructions were defective in failing to state that the jury could return a verdict of life without parole even if the circumstances in aggravation outweighed those in mitigation. Although such an instruction is not required (*People v. Kipp, supra,* 18 Cal.4th at p. 381), the trial court gave a special instruction so stating: "Each juror is free to assign whatever moral or sympathetic value he or she deems appropriate to each and all the various factors before him. You are free to reject death as inappropriate under the circumstances, even if you believe that the aggravating evidence predominates over the mitigating."

## XV. *Appellate Review Process*

██ Defendant raises various challenges to the process for appellate review of death judgments in this state. As we have previously explained, the process is not constitutionally defective in failing to provide for comparative or intercase proportionality review. (*People v. Lucero, supra,* 23 Cal.4th at p. 741.) Although a death sentence is subject to intracase proportionality review (*id.* at pp. 739-740), defendant makes no claim that his sentence is grossly disproportionate to his moral culpability for the crimes he committed, and we conclude that it is not.

Defendant contends that the attorney appointed to represent him on this appeal is "burdened by an unconstitutional conflict of interest" because the same attorney was also appointed to investigate potential claims to be raised in a petition for a writ of habeas corpus.[4] Defendant analogizes this dual representation on appeal and in a proceeding on a habeas corpus petition to representation by the same attorney at trial and on appeal, a situation in which courts have recognized "an inherent conflict" because counsel "is in the untenable position of urging his own incompetency." (*People v. Bailey* (1992) 9 Cal.App.4th 1252, 1254-1255 [12 Cal.Rptr.2d 339]; see also *Burns v. Gammon* (8th Cir. 1999) 173 F.3d 1089, 1092.)

Defendant's argument explains why habeas corpus counsel might potentially be burdened by a conflict of interest if placed in the position of urging counsel's own incompetence as appellate counsel,[5] but it does not explain how this dual appointment could in any way interfere with counsel's effective representation on the appeal. Thus, defendant has failed to demonstrate that appellate counsel is burdened by an actual or potential conflict of interest.

Defendant's claim that habeas corpus counsel is burdened by a conflict of interest is not cognizable here on direct appeal. Moreover, it lacks merit in any event as defendant has no right under the federal Constitution to the

---

[4]This court no longer routinely appoints the same attorney to represent a defendant under judgment of death on both the automatic appeal and on a petition for a writ of habeas corpus. (See Gov. Code, § 68663 ["No counsel appointed to represent a state prisoner under capital sentence in state postconviction proceedings shall have previously represented the prisoner at trial or on direct appeal in the case for which the appointment is made, unless the prisoner and counsel expressly requests [*sic*] continued representation."]; Supreme Ct. Policies Regarding Cases Arising From Judgments of Death, policy 3, std. 2-1 ["This court's appointment of habeas corpus counsel for a person under a sentence of death shall be made simultaneously with appointment of appellate counsel or at the earliest practicable time thereafter."]; *In re Robbins* (1998) 18 Cal.4th 770, 792, fn. 13 [77 Cal.Rptr.2d 153, 959 P.2d 311].)

[5]We observe, however, that this court has received petitions for writ of habeas corpus in which counsel have asserted their own ineffectiveness on appeal.

effective assistance of counsel in a state habeas corpus proceeding (*Coleman v. Thompson* (1991) 501 U.S. 722, 756-757 [111 S.Ct. 2546, 2568-2569, 115 L.Ed.2d 640]; *Murray v. Giarratano* (1989) 492 U.S. 1, 10 [109 S.Ct. 2765, 2770-2771, 106 L.Ed.2d 1] (plur. opn. of Rehnquist, C. J.); *id.* at pp. 14-15 [109 S.Ct. at pp. 2772-2773] (conc. opn. of Kennedy, J.)), although the alleged deficiencies of habeas corpus counsel, whether the result of a conflict of interest or some other cause, may be considered when determining the applicability of procedural bars (*In re Sanders* (1999) 21 Cal.4th 697, 719 [87 Cal.Rptr.2d 899, 981 P.2d 1038]). Thus, the appointment of a single attorney to represent defendant on direct appeal and on any petition for writ of habeas corpus does not violate the state or federal Constitution.

## XVI. *Political Influences on California Appellate Review Process*

 Defendant contends that the process for appellate review of death judgments in California is dominated by political considerations and for this reason violates the due process and equal protection guarantees of the state and federal Constitutions. He notes that between 1979 and 1986, this court reversed 95 percent of the death judgments it reviewed. In 1986, there was a "strenuous and well publicized campaign to unseat [three members of this court] at the impending retention election." (*People v. Cox* (1991) 53 Cal.3d 618, 696 [280 Cal.Rptr. 692, 809 P.2d 351].) This campaign "coalesced around the high percentage of death penalty reversals." (*Ibid.*) The campaign was successful, and the Chief Justice and two associate justices were removed from office and replaced by new appointees. Between July 1987 and December 1994, this court affirmed 84 percent of death penalty cases, and between 1990 and 1994 the affirmance rate was 94 percent.

Under the due process clause of the federal Constitution, defendant is entitled to an impartial trial judge (*Arizona v. Fulminante* (1991) 499 U.S. 279, 309 [111 S.Ct. 1246, 1264-1265, 113 L.Ed.2d 302]; *People v. Brown* (1993) 6 Cal.4th 322, 332 [24 Cal.Rptr.2d 710, 862 P.2d 710]), and we assume that defendant is also entitled to have his automatic appeal decided by appellate justices who are impartial. He is not, however, entitled to have his appeal decided by justices who have never formed or expressed opinions or thoughts on general topics such as the propriety of the death penalty. " 'Bias in the sense of crystallized point of view about issues of law or policy is almost universally deemed no ground for disqualification.' " (*Andrews v. Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781, 790 [171 Cal.Rptr. 590, 623 P.2d 151], quoting 2 Davis, Administrative Law Treatise (1st ed. 1958) p. 131; see also *Aetna Life Insurance Co. v. Lavoie* (1986) 475 U.S. 813, 821 [106 S.Ct. 1580, 1585, 89 L.Ed.2d 823]; *U.S. v. Payne* (9th Cir. 1991) 944 F.2d 1458, 1476-1477.)

Defendant argues, however, that the members of this court each have an actual conflict of interest because, as defendant puts it, "for a justice of this Court to keep his or her job, death sentences must be affirmed." Even if we assume for argument's sake that there is some relationship between affirmance of death sentences and retention in office, defendant fails to demonstrate that a justice of this court must affirm every death sentence or any particular death sentence, much less defendant's own sentence. Thus, defendant does not persuade us that members of this court have a disabling conflict of interest in determining this appeal. Even if such a conflict of interest existed, moreover, it would apply equally to all California judges and, under the common law rule of necessity, the justices of this court would not be disqualified. (*Olson v. Cory* (1980) 27 Cal.3d 532, 537 [178 Cal.Rptr. 568, 636 P.2d 532].)

XVII. *Cumulative Effect of Asserted Penalty Phase Errors*

Defendant argues that even if no single error requires reversal of the penalty verdict of death, the cumulative effect of the errors at the guilt and penalty phases must be deemed sufficiently prejudicial to warrant this remedy. Apart from a single instance of guilt phase prosecutorial misconduct, which we have found nonprejudicial, defendant has failed to demonstrate that error occurred at either the guilt or the penalty phase. Accordingly, there could be no cumulative effect.

DISPOSITION

The judgment is affirmed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., Brown, J., and Kremer, J.,* concurred.

Appellant's petition for a rehearing was denied January 29, 2002.

---

*Presiding Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6, of the California Constitution.