Filed 6/27/13  P. v. Jones CA1/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>NAVARRE JONES,<br><br>        Defendant and Appellant. | A134035<br><br>(Contra Costa County<br>Super. Ct. No. 5-110393-6) |

Navarre Jones (appellant) was convicted, following a jury trial, of two counts of second degree robbery, based on his participation in a robbery at Bank of the West in Antioch.  On appeal, he contends (1) the trial court improperly admitted into evidence both a witness's testimony regarding an uncharged robbery and that witness's prior recorded statement to police; (2) the court erred by failing to instruct the jury sua sponte with CALCRIM No. 419; and (3) the court improperly ordered him to pay $7,294 in restitution to Bank of the West.  We shall affirm the judgment.

### PROCEDURAL BACKGROUND

Appellant was charged by information with three counts of second degree robbery (Pen. Code, § 211/212.5, subd. (c)).

Following a trial, the jury found appellant guilty of two of the three counts of second degree robbery.  The jury could not reach a verdict on one of the counts, and the court dismissed that count.

On November 16, 2011, the trial court sentenced appellant to two years in state prison.

1

On November 29, 2011, appellant filed a notice of appeal.

## FACTUAL BACKGROUND

Patricia Q. testified under a grant of immunity. She testified that she met appellant in July 2010, when she was 17 years old. She was already friends with Jeff Mason and Leonid Breshnev Martinez-Gonzalez, the latter of whom she had known for a couple of years. In July 2010, she began staying with the three men at hotels in Walnut Creek and Concord.

During the three to four weeks the four of them were hanging out, Martinez-Gonzalez suggested to the other three that they start robbing liquor stores. Patricia recalled that both she and appellant disagreed with the idea. Subsequently, Martinez-Gonzalez suggested that they rob a bank. Initially, she and appellant said no, but eventually they all agreed to help commit robberies. To prepare for the robberies, they bought masks, bandanas, and gloves. The group also had baseball hats and a stun gun, as well as a handgun and a rifle, both of which Patricia understood shot only BBs.

On August 3, 2010, Patricia used Martinez-Gonzalez's gray Honda Civic to drive the three men to a Fast and Easy Mini-Mart in Benicia. Patricia could not recall who went into the store, but she remembered that the stun gun was brought inside. She did not know how much money was taken from the store.

After the Benicia robbery, Patricia, Martinez-Gonzalez, Mason, and appellant discussed robbing a bank that Martinez-Gonzalez had selected. On August 4, 2010, Patricia drove Martinez-Gonzalez, Mason, and appellant in the Honda Civic to the parking lot of the Bank of the West in Antioch. She went inside first to scope out where people were and what they were doing. She then returned to the car and told the three men what she had seen.

Patricia then drove the group to see her friend, Corinne C., to invite her to go with them to Las Vegas. Patricia and the three men then returned to the bank parking lot, where the Martinez-Gonzalez, Mason, and appellant put masks and bandanas on their faces. Mason had the stun gun, Martinez-Gonzalez had the rifle, and appellant had the handgun. Patricia backed the car to right in front of the bank's doors, and the three men

2

exited the car and went inside the bank. After about 80 seconds, all three men returned to the car and Patricia drove to a nearby park where they discarded clothing, the rifle and handgun, and the masks used in the robbery.

Patricia left the men at the park while she went to pick up Corinne from her house. That night, Patricia, Corinne, Martinez-Gonzalez, Mason, and appellant spent the night at the Concord Hilton. In the hotel room, they counted the money from the bank robbery and split it four ways between Patricia, Martinez-Gonzalez, Mason, and appellant. The following morning, the two women and three men went to Las Vegas in the Honda Civic. They stayed a couple of days at the Hotel Luxor before leaving together, again in the Honda Civic.

That afternoon, they stopped at a mini-mart in San Bernardino. Patricia went inside and, when she returned to the car, she said there was only one person inside, who was working there. At least two of the men then entered the store and attempted to rob it. A short time later, the men ran back to the car; the store employee was following them. As the men got into the car, the employee threw a bat at the back window, which shattered.

At trial, Patricia identified a photograph of appellant, explaining that she knew the photograph was of him because he was the only one who wore jeans with holes in them and he "wore them all the time."

Shortly after returning home from Las Vegas, Patricia spoke with an Antioch police detective and an FBI agent who came to her house. When she spoke with the officers, she did so voluntarily and told them the truth. She did not know at the time if she would be charged with any offense, but she did tell them she wanted to work with them and be a witness. Patricia acknowledged at trial that she had been granted immunity for her testimony in court, but she understood that she could still be prosecuted for her conduct in the bank robbery on August 4, 2010.

On cross-examination, Patricia acknowledged that Alameda County had filed robbery charges against her for her part in the Dublin robbery. She had spent time in custody and was now on probation for the Alameda County offense. No criminal charges

had been filed against her in Contra Costa County for the Antioch bank robbery or in Solano County for the Benicia robbery.

On redirect examination, Patricia testified that, the day after she gave the statement to Detective Castillo and Agent Ernst, she was arrested and subsequently prosecuted for a robbery committed in Dublin on August 2, 2010.

Patricia then testified that, on August 2, 2010, she had driven Martinez-Gonzalez, Mason, appellant, and a female friend of hers by an AM/PM store at a gas station in Dublin when it was decided to rob the store. She did not recall whose idea it was. Patricia first went into the store to scope it out. When she returned, she told the three men what she had seen. At least two of the men—she was not sure which ones—went inside the store. When they returned to the car, Patricia drove them away. She later testified that she did not recall if she had told Detective Castillo and Agent Ernst that appellant was involved in the Dublin robbery, or whether he was in fact involved in it.

Following Patricia's testimony, her August 12, 2010 recorded interview with Ernst and Castillo was played for the jury. During the interview, she admitted her involvement in the Bank of the West robbery in Antioch, as well as the Dublin, Benicia, and San Bernardino robberies. She also told the officers that appellant had participated in the Bank of the West robbery.

Corinne C. testified that she spent a Thursday night at the Concord Hilton with Patricia, Martinez-Gonzalez, and two other men, before leaving the next day for Las Vegas. The five of them drove to Las Vegas in a blue Honda Civic, arriving early Saturday morning. They spent the night in a room at the Luxor Hotel. They paid for the room in cash and Corinne saw a large stack of money on a table in the hotel room.

The next day, Sunday, they set off to drive home. Patricia was driving when they stopped at a gas station mini-mart in the San Bernardino area. Corinne went inside to use the restroom and then returned to the car. Martinez-Gonzalez asked her questions about how many people were in the store and what kind of counter there was. The three men then jumped out of the car and she saw all of them go inside the store. After less than 15 seconds, the men returned and jumped into the car. She then heard a smash and saw that

4

the back window was shattered.  She also saw the shadow of a person outside the car before Patricia quickly drove away.

Regarding the two men besides Martinez-Gonzalez who were with them from Thursday night until Sunday, Corinne testified that the others called the White man "Mason."  She did not get a good look at the Black man, who kept himself apart from the group, but she recalled that he wore a purple and black hat, a black muscle shirt, and blue jeans.

Catherine Oetjen, a financial advisor with Bank of the West, testified that, on August 4, 2010, she was seated at a desk in the Antioch branch of the bank when three people ran inside wearing masks and hats.  One of them pointed a gun at Oetjen and told her to put her hands up.   She then saw two of the men jump over the counter to where the tellers were working, and she heard them say to give them "the cash."  The man who stayed behind had a red bandana over his face and was holding a rifle.  The men left the bank a short time later and, when she looked out the window, Oetjen saw a blue Honda leaving the parking lot.

David Hernandez, a trainee at the bank, was behind the teller counter at the time of the robbery.  He saw that one of the robbers who came over the counter was wearing a baseball cap and had a blue bandana covering his face; he was also holding a "little Taser clicker gun."  From the man's voice, Hernandez believed he was African-American.

Etelih Gloriani, a teller at the bank, testified that she saw a car back into a spot in front of the bank and saw three men get out of the car and run inside the bank.  They said, "this is a robbery."  One man was holding a Taser, but she did not get a good look at him.  Another man was wearing a blue hoodie sweatshirt , a hat, and shorts, and had a bandana or a painter's mask covering his face; he was also holding a rifle.  The man holding the rifle, who Gloriani believed was Hispanic, stood in front of her and said to give him her cash.  Another man who had come over the counter took the money that she had placed on the counter.  That man was African-American and was wearing a black hoodie sweatshirt and faded jeans with a white stain on the front.  He was holding a smaller handgun. The men then left the bank and got into the same car they had been in earlier.

The car was a fairly new dark tan Honda Accord.

Diana Aburto, also a teller at the bank on the day of the robbery, saw the three men with guns enter the bank. The smallest man shouted that it was a robbery and everyone should get down. He was wearing a sweater-type hoodie, jeans, and sneakers. He also had a hospital mask over his face. One man jumped over the teller counter and took the money she got out of her teller cans; he was holding a small handgun, which he held to her back as he told her to hurry. That man was wearing jeans, tennis shoes, a hooded sweater, and had a bandana covering his face. A third man was standing in front of a teller named Jerry. He was wearing a hoodie and had a blue bandana covering his face; he was holding a Taser. The small man went up to Gloriani; he was holding a shotgun or rifle. She thought all three suspects were Black.

Branch manager Monique Wilmott testified that there were numerous video cameras in and around the bank. Video taken during the robbery was played for the jury. Wilmott further testified that she had determined how much money had been stolen during the robbery. At trial, she could not remember the exact amount taken, but knew that it was about $7,000.

Charles Blazer, a detective with the Pittsburg Police Department, testified that he was off duty in Concord on August 12, 2010, when he spotted a blue Honda that fit the description of a vehicle mentioned in police bulletins related to a bank robbery in Antioch, except that the back window of this car was partially shattered. Blazer called the Antioch and Concord Police Departments, and several Concord police units arrived. Officers then arrested the two occupants of the Honda as they attempted to walk away from the scene.

Santiago Castillo, a detective with the Antioch Police Department, testified that, on August 12, 2010, he and FBI Special Agent Matt Ernst met with Patricia at her home. On August 16, 2010, Castillo searched the blue Honda, from which he recovered, inter alia, a stun gun and a receipt for the Luxor Hotel in Las Vegas, on which appellant's name appeared.

On September 1, 2010, Castillo searched appellant's residence and found a pair of

jeans that had patches on the thigh as well as green and white paint splatters on the legs, and a pair of black Nike tennis shoes. The jeans were identical to the jeans worn by the Black man who participated in the Bank of the West robbery, as shown in the bank surveillance video. The Nike shoes were also similar, in terms of their laces, soles, and markings, to the shoes worn by the same man in the surveillance video. Castillo found a red bandana, folded in the shape of a triangle, with frayed ends consistent with their having been tied into a knot to form a mask. He also found a blue and red baseball hat.

## DISCUSSION

### I. *Admission of Patricia C.'s Testimony Regarding the Dublin Robbery and her Recorded Statement to Police*

Appellant contends the trial court improperly admitted Patricia C.'s testimony regarding the uncharged Dublin robbery and her prior recorded statement to police.

### A. *Trial Court Background*

The prosecution moved in limine, pursuant to Evidence Code section 1101, subdivision (b),[1] to introduce evidence at trial of three uncharged robberies, including the August 2, 2010 robbery of the AM/PM store in Dublin; the August 3, 2010 robbery of the Fast and Easy Mini-Mart in Benicia; and the August 8, 2010 robbery of the gas station mini-mart in San Bernardino. The trial court ruled that evidence of the Dublin robbery would be excluded, but that evidence of the other two robberies would be admitted. The court explained its ruling as follows: "I do believe that the evidence I'm admitting is very compelling and probative evidence of a number of issues, primarily identity, common scheme and plan, and concerted action by a group of co-conspirators to commit a series of robberies.

"I understand that same argument can apply to August 2nd, but since there is no evidence of the defendant's actual participation in the robbery I don't think the evidence is sufficiently strong as to August 2nd to have the probative value outweigh the

---

[1] All further statutory references are to the Evidence Code unless otherwise indicated.

7

prejudicial effect, because obviously the proof of other robberies is prejudicial."

Patricia did not testify about the Dublin robbery on direct examination. On cross-examination, defense counsel asked Patricia about her interview with Detective Castillo and FBI Special Agent Ernst. In addition to confirming that no charges had been filed against her in Solano and Contra Costa Counties, counsel asked about the August 2 incident in Dublin, as follows:

"Q. But Alameda County did file robbery charges against you, right?

"A. Yes, sir.

"Q. You were convicted of robbery in Alameda County, right?

"A. Yes, sir.

"Q. You spent a period of time, just until [a] week or so ago in custody for that, right?

"A. Yes, sir.

"Q. You don't want to go back to custody, do you?

"A. No, sir.

"Q. And now you are on probation for that Alameda offense today, right?

"A. Yes, sir.

"Q. And if you violate the probation you know that you can go back to custody, right?

"A. Yes, sir."

Subsequently, outside the presence of the jury, the prosecutor argued that defense counsel had opened the door to the prosecutor questioning Patricia about the Dublin robbery on redirect examination. The court granted the prosecutor's request to ask Patricia about that robbery, explaining that it believed the door has been opened on cross-examination and the prosecutor was "entitled to come back and give us the surrounding circumstances of her conduct that resulted in the juvenile adjudication in Alameda County.

"Also, since the motions in limine, I have heard testimony this conspiracy was discussed and planned prior to any of the robberies and that this was a string of planned

8

and coordinated robberies that was discussed among the four people we have been talking about prior to the commission of the robberies and, therefore, the analysis that I made prior to trial was based on less than full understanding of the evidence.

"To me, this robbery is clearly part of the conspiracy in the string which is what the People argued. But the proffer didn't contain, as I recall, the statement that the four of them had discussed it together prior to the commission of the robberies.

"So for both reasons I think the door is open as to the Alameda County Dublin robbery and the circumstances surrounding it."

Accordingly, as set forth in the Factual portion of this opinion, *ante*, on redirect examination, Patricia answered questions about the Dublin robbery and the statement she gave to Detective Castillo and Agent Ernst.

Following Patricia's testimony, the prosecutor asked the court, outside the presence of the jury, to admit Patricia's taped statement to police as a prior consistent statement, given that defense counsel had "challenged her credibility and inferred that she is lying about facts and circumstances. [¶] . . . [¶] . . . I believe that allows me at this point in time to introduce her recorded interview with the police officers on August 12th prior to her arrest for the Alameda offense, prior to the adjudication of the Alameda offense and substantially before she ever testified at the preliminary hearing or in this case with a grant of immunity."

The court, citing, inter alia, section 791, expressed its tentative belief that the prior consistent statement was admissible "because the statements were made before at least some of the alleged motive to fabricate arose in the prosecution's or lack of prosecution's [*sic*] after the statements."

The court subsequently allowed the prosecutor to play the tape recorded August 12, 2010 interview with Patricia for the jury.

### B. *Legal Analysis*

#### 1. *Patricia C.'s Testimony Regarding the Dublin Robbery*

"Subdivision (a) of section 1101 prohibits admission of evidence of a person's character, including evidence of character in the form of specific instances of uncharged

9

misconduct, to prove the conduct of that person on a specified occasion. Subdivision (b) of section 1101 clarifies, however, that this rule does not prohibit admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 393, fn. omitted, superseded on other grounds as stated in *People v. Britt* (2002) 104 Cal.App.4th 500, 505.)

We review a trial court's ruling pursuant to sections 1101, subdivision (b), and 352 under the deferential abuse of discretion standard. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121; *People v. Hayes* (1990) 52 Cal.3d 577, 616.)

In the present case, the trial court initially found that Patricia C.'s testimony about the Dublin robbery was inadmissible under section 1101, subdivision (b), because its probative value was outweighed by its potentially prejudicial effect. (See § 352.) After hearing Patricia's testimony, however, the court found that it showed "a string of planned and coordinated robberies that was discussed among the four people we have been talking about prior to the commission of the robberies . . . ." The court stated that its pretrial ruling "was based on less than full understanding of the evidence," i.e., that "the four of them had discussed [the plan to commit robberies] prior to the commission of the robberies." Because the court now understood that the Dublin robbery was "clearly part of the conspiracy in the string" of robberies, as the prosecution had previously argued, the court revisited its earlier ruling and decided to permit the prosecutor to question Patricia about the circumstances of the Dublin robbery on redirect examination.[2]

We conclude that the trial court did not abuse its discretion when, after hearing Patricia's testimony, it reweighed the probative value of the Dublin robbery evidence against its prejudicial effect, and decided to admit the evidence pursuant to section 1101,

_____

[2] The court also found that defense counsel had opened the door to this testimony by asking Patricia on cross-examination about her arrest and conviction in Alameda County. However, because, as we shall discuss, *post*, we conclude the court properly admitted this evidence pursuant to section 1101, subdivision (b), we need not address the propriety of this additional ground for its ruling.

subdivision (b). As the court explained, Patricia's testimony showed that appellant had agreed to participate in a series of robberies before the Dublin robbery took place. Whether or not appellant actually went inside the store during that robbery, the evidence showed that he was part of the ongoing conspiracy to commit robberies, such as the one in Dublin. The court reasonably concluded that this evidence was more probative than prejudicial, and therefore admissible to show that the Dublin robbery was part of the "concerted action by a group of co-conspirators [of which appellant was a part] to commit a series of robberies." (See *People v. Kipp, supra*, 26 Cal.4th at p. 1121; *People v. Hayes*, *supra*, 52 Cal.3d at p. 616; see also *People v. Ewoldt* , *supra*, 7 Cal.4th at p. 393.)

### 2. *Patricia C.'s Prior Recorded Statement to Police*

Section 1236 authorizes the admission of a witness's hearsay statement if the statement is consistent with the witness's trial testimony and is offered in compliance with section 791. Section 791, subdivision (b), allows for the admission of a prior consistent statement if offered after "[a]n express or implied charge has been made that [the witness's] testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."

Our Supreme Court has explained the application of section 791: "A prior consistent statement logically bolsters a witness's credibility whenever it predates *any* motive to lie, not just when it predates all possible motives. Accordingly, under Evidence Code section 791, 'a prior consistent statement is admissible as long as the statement is made before the existence *of any one of the motives* that the opposing party expressly or impliedly suggests may have influenced the witness's testimony.' [Citation.]" (*People v. Hillhouse* (2002) 27 Cal.4th 469, 492.)

Here, on cross-examination, defense counsel asked Patricia C. whether she had been charged with any offenses and, in particular, about her criminal case in Alameda County. Counsel's questions about that case—related to her having been in custody in Alameda County, as well as to her being on probation and not wanting to return to

11

custody—plainly implied that her testimony was influenced by an improper motive, i.e., her desire to stay out of custody. (See § 791, subd. (b).) Patricia's taped interview with police, admitted at the prosecutor's request following this cross-examination, contained statements consistent with her testimony at trial about her and appellant's involvement in the robberies.

The trial court properly found that Patricia's prior statement, given before her arrest for her role in the Dublin robbery, predated a motive to lie based on her prosecution in that case. Section 791 permits admission of prior consistent statements that predate any motive to fabricate, "not just when it predates all possible motives." (*People v. Hillhouse*, *supra*, 27 Cal.4th at pp. 491–492 [defense's use of witness's plea agreement to attempt to cast doubt on witness's credibility "made the consistent statements predating the agreement admissible to support his credibility"].) Hence, the court did not abuse its discretion when it admitted the statement. (See *People v. Breaux* (1991) 1 Cal.4th 281, 302 [applying abuse of discretion standard of review to trial court's ruling pursuant to section 791].)

### 3. *Harmless Error*

In any event, even if admission of Patricia's testimony regarding the Dublin robbery and her prior statement to police were an abuse of discretion, appellant cannot show prejudice. The additional evidence of appellant's guilt of the charged offense was extremely strong. Other properly admitted evidence included Patricia's testimony about appellant's involvement in the bank robbery and two other similar robberies; the victims' testimony corroborating Patricia's testimony about the bank robbery; the clothes found in appellant's apartment, which matched clothes worn by one of the robbers as shown in the bank's surveillance video and described by some of the victims; and a receipt from the Luxor Hotel in Las Vegas with appellant's name on it, which was found in the Honda. It is not reasonably probable that the result in this case would have been different had the court not admitted the challenged evidence. (See *People v. Watson* (1956) 46 Cal.2d 818, 836.)

12

## II. *Trial Court's Failure to Give CALCRIM No. 419*

Appellant contends the trial court erred by failing to instruct the jury sua sponte with CALCRIM No. 419, regarding acts or statements a defendant made before joining a conspiracy.

In a criminal case, a trial court is required to instruct the jury, sua sponte, on the general principles of law that are relevant to the issues raised by the evidence and necessary to the jury's understanding of the case. (*People v. Martinez* (2010) 47 Cal.4th 911, 953.)

CALCRIM No. 419 reads as follows:

"(The/A) defendant is not responsible for any acts that were done before (he/ [or] she) joined the conspiracy.

"You may consider evidence of acts or statements made before the defendant joined the conspiracy only to show the nature and goals of the conspiracy. You may not consider any such evidence to prove that the defendant is guilty of any crimes committed before (he/ [or] she) joined the conspiracy."

A Bench Note for CALCRIM No. 419 states: "The court has a **sua sponte** duty to give this instruction if there is evidence suggesting that the defendant joined an alleged conspiracy after the crime was committed or after an act or statement was made to further the object of the conspiracy."

Here, the record reflects that, on cross-examination, Patricia testified that appellant was not present for the first discussion about committing a robbery. Patricia's testimony also makes clear, however, that Martinez-Gonzalez raised the idea in appellant's presence in late July and ultimately persuaded appellant to join him in committing robberies. Patricia's testimony also reflects that an agreement to commit robberies was made between Martinez-Gonzalez, Mason, Patricia, and appellant before any acts in furtherance of that agreement took place.

Because the evidence showed that all actions related to the robberies took place after appellant joined the conspiracy, the trial court was not required to give CALCRIM No. 419 sua sponte. (See Bench Note to CALCRIM No. 419.)

13

### III. *The Restitution Order*

Appellant contends the trial court improperly ordered him to pay $7,294 in restitution to Bank of the West. He notes that, at trial, Bank of the West branch manager, Monique Wilmott, testified that she could not remember the exact amount taken, but that it was about $7,000.

### A. *Trial Court Background*

The probation report indicates that branch manager Wilmott had been contacted by the probation department. The report further states, under the heading "Restitution," that "Bank of the West is a victim in this matter as $7,294 was stolen."

At the sentencing hearing, the court stated that it had read and considered the probation report, as well as the sentencing memoranda submitted by the prosecutor and defense counsel. Defense counsel confirmed that he had received the probation report. The court later stated that the "loss in this case was very substantial, $7,294." The court then ordered appellant to "pay actual restitution to the Bank of the West of $7[,]294." Defense counsel confirmed with the court that the restitution amount would be joint and several as to all defendants, but made no objection to the amount of restitution ordered.

### B. *Legal Analysis*

Penal Code section 1202.4, subdivision (f), provides in relevant part: "[I]n every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court."

"A restitution order is reviewed for abuse of discretion and will not be reversed unless it is arbitrary or capricious. [Citation.] No abuse of discretion will be found where there is a rational and factual basis for the amount of restitution ordered. ' "[T]he standard of proof at a restitution hearing is by a preponderance of the evidence, not proof beyond a reasonable doubt." ' [Citation.] [Penal Code s]ection 1202.4 does not, by its terms, require any particular kind of proof. However, the trial court is entitled to consider the probation report, and, as prima facie evidence of loss, may accept a property owner's

14

statement made in the probation report about the value of stolen or damaged property. [Citations.] Once the victim makes a prima facie showing of economic losses incurred as a result of the defendant's criminal acts, the burden shifts to the defendant to disprove the amount of losses claimed by the victim. [Citation.] The defendant has the burden of rebutting the victim's statement of losses, and to do so, may submit evidence to prove the amount claimed exceeds the repair or replacement cost of damaged or stolen property. [Citation.]" (*People v. Gemelli* (2008) 161 Cal.App.4th 1539, 1542–1543.)

As a preliminary matter, respondent asserts that appellant forfeited this claim due to his failure to object to the restitution order in the trial court. (See, e.g., *People v. O'Neal* (2004) 122 Cal.App.4th 817, 820 [defendant waived challenge to restitution order by not challenging it in the trial court]; *People v. Le* (1995) 39 Cal.App.4th 1518, 1523 [same].) Even assuming the claim is not forfeited, it nevertheless fails on the merits.

Although, as she was testifying at trial, bank manager Monique Wilmott stated that she did not recall the exact amount of money stolen during the robbery, after subsequently contacting Wilmott following the trial, the probation officer reported that $7,294 was the amount stolen. The court could reasonably rely on the amount of the loss set forth in the probation report to determine the amount of restitution to order. (See *People v. Gemelli*, *supra*, 161 Cal.App.4th at p. 1543 [trial court is entitled to consider the probation report in deciding restitution amount].) Appellant offered no evidence of his own to rebut the evidence of loss provided. (See *ibid*.) Appellant has shown no abuse of discretion. (See *id.* at p. 1542.)

## *DISPOSITION*

The judgment is affirmed.

                                             _____

                                             Kline, P.J.

We concur:

_____

Haerle, J.

_____

Richman, J.