Filed 5/26/21 In re Ed. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re Ed., et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D078485 |
| Plaintiff and Respondent, | (Super. Ct. Nos. NJ15535C-D) |
| v. | |
| A.R., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner. Affirmed.

Sean Angele Burleigh, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Patrice Plattner-Grainger, Senior Deputy County Counsel, for Plaintiff and Respondent.

A.R. (Father) appeals from an order of the juvenile court at the contested 12-month permanency hearing terminating his reunification services as to his daughters Ed. (born 2018) and Ek. (born 2019). Father contends the Agency failed to provide reasonable reunification services to address his lack of housing or aggression issues. Because substantial evidence supports the juvenile court's determination that Father received reasonable reunification services, we affirm the order.

FACTUAL AND PROCEDURAL BACKGROUND

In July 2019, the San Diego County Health and Human Services Agency (the Agency) filed a petition on behalf of 11-month-old Ed. alleging a substantial risk existed that she would suffer serious physical harm inflicted non-accidentally by R.F. (Mother), who had hit Ed.'s two older half-siblings with belts and extension cords causing welts on their backs, arms, and legs. The petition also alleged that Mother had a history of juvenile court intervention in Arizona due to her violent and assaultive behavior.[1] The Arizona court later relinquished subject matter jurisdiction. Although Mother had no contact information for Father, the Agency undertook a search and attempted to notice Father by leaving voicemails at his last known telephone numbers, but received no response.

At the detention hearing, the juvenile court found a prima facie showing had been made that Ed. was a person described by Welfare and

_____

[1] The Agency also filed petitions on behalf of Ed.'s two half-siblings who are not parties to this appeal. Mother did not appeal and will be mentioned only when relevant.

Institutions Code[2] section 300, subdivision (a), and ordered her detained in out-of-home care. In August 2019, Mother gave birth to Ek. and identified appellant as the father. The Agency filed a petition on Ek.'s behalf based on the same concerns and subsequently detained the infant in a licensed foster home with Ed. At the contested jurisdiction and disposition hearing in October 2019, the juvenile court sustained the petitions, removed the children from Mother's custody and ordered reunification services for Mother.

On January 31, 2020,[3] Father came forward requesting genetic testing and appointment of counsel. The testing showed him as Ek.'s biological father. The juvenile court named Father as Ed.'s presumed father and Ek.'s biological father. On February 11, the juvenile court ordered supervised visits and reunification services for Father, specifying that Father is to be screened for substance abuse treatment, and offered parenting classes and domestic violence treatment. Father also filed a section 388 petition requesting placement of the children which the court denied.

The juvenile court commenced the contested six-month hearing on July 17 and held the hearing remotely due to the COVID-19 pandemic. On August 10, Mother sought a temporary restraining order (TRO) against Father, based on Father's " 'stalking', 'intimidating', damage to her property and instability." On August 19, Father was arrested for violating the TRO, disorderly conduct and possessing a controlled substance and/or drug paraphernalia.

---

[2]     Undesignated statutory references are to the Welfare and Institutions Code.

[3]     Undesignated date references are to 2020.

Due to pandemic related court closures, the remote six-month hearing concluded on September 1.  The juvenile court found a return to parental custody would be detrimental and confirmed the children's placement in licensed foster home care.  The court also found that the Agency had offered reasonable services, Mother and Father had made some progress on their case plans, and ordered the Agency to provide services consistent with the case plans.

The juvenile court remotely held the contested 12-month permanency hearing on January 13, 2021.  It received into evidence the Agency's reports and heard testimony from the social worker and Father.  The court found by clear and convincing evidence a return of the children to parental custody would be detrimental and the services provided had been reasonable.  It found a substantial probability existed that the children could be returned to Mother's custody by the 18-month date and ordered additional services for Mother but terminated Father's services.  It continued the children as dependents, ordered that they remain placed in licensed foster home care, and scheduled the 18-month permanency hearing less than two weeks later.  Father timely appealed.

## DISCUSSION

### A. *General Legal Principles*

The purpose of a reunification plan is "to overcome the problem that led to removal in the first place." (*Blanca P. v. Superior Court* (1996) 45 Cal.App.4th 1738, 1748.)  "Each reunification plan must be appropriate to the particular individual and based on the unique facts of that individual." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545 (*Misako*).)  It is the Agency's responsibility "to provide reasonable reunification services in spite of difficulties in doing so or the prospects of success." (*In re Taylor J.* (2014) 223

Cal.App.4th 1446, 1451.)  To support a finding of reasonable services, "the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult. . . ."  (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.)  "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances."  (*Misako, supra*, at p. 547.)

We review the juvenile court's reasonable services findings for substantial evidence.  (*In re Amanda H.* (2008) 166 Cal.App.4th 1340, 1346.) We must view the evidence in a light most favorable to the respondent and indulge in all reasonable and legitimate inferences to uphold the judgment. (*Misako*, *supra*, 2 Cal.App.4th at p. 545.)  "If there is any substantial evidence to support the findings of a juvenile court, a reviewing court is without power to weigh or evaluate the findings."  (*In re Carrie W.* (1978) 78 Cal.App.3d 866, 872.)  The remedy for failing to offer or provide reasonable services is to extend the reunification period and continue services.  (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 975.)

While the juvenile court did not set a section 366.26 hearing since it continued Mother's services, the juvenile court found by clear and convincing evidence Father had been offered reasonable services.  The statute is silent on the standard of proof when a section 366.26 hearing is not set.  (§ 366.21, subd. (f)(1)(A).)  Father argues that the clear and convincing standard should apply and the Agency contends that the preponderance of the evidence standard applies.  "When a statute is silent on the standard of proof, the preponderance of the evidence standard ordinarily applies."  (Evid. Code, §

5

115 ['Except as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence.'].)" (*Katie V. v. Superior Court* (2005) 130 Cal.App.4th 586, 594.) However, assuming without deciding that the clear and convincing evidence standard applies, we still find substantial evidence supports the juvenile court's order.[4]

B. *Analysis*

Father contends the juvenile court erred in finding that reasonable reunification services had been provided during the relevant reporting period from September 1, 2020 to the time of trial on January 13, 2021, because the Agency failed to provide housing referrals and delayed in referring him to a domestic violence program. He contends the Agency's expectation that he engage in services without first providing him shelter is unreasonable and that homelessness can be a contributing factor in substance abuse and can make someone prone to anger. The Agency disagrees, contending that review of the entire record shows that it provided reasonable services to Father. We agree with the Agency.

At the 12-month hearing, Father testified that he had not been able to fully participate in substance abuse treatment or individual therapy during the preceding six to eight months due to lack of housing. He claimed that he did not have a place to charge his phone and that he lacked internet access for remotely provided substance abuse treatment. Father explained to two

---

[4] "Clear and convincing evidence requires a high probability, such that the evidence is so clear as to leave no substantial doubt." (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1238.) A reviewing court will uphold a finding based upon clear and convincing evidence if "the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true"—in this instance, that the Agency provided or offered reasonable services to Father. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)

social workers that his lack of housing impacted his ability to complete his services, but that neither provided him any housing referrals.

On appeal, Father passionately argues that his homelessness caused his problems and he could not address his other issues until he had shelter. He claims that he had nowhere to charge his phone and could not participate in services because he lacked internet access to participate in remotely provided services during the pandemic. The record, however, belies Father's assertions, puts his credibility into question, and supports the conclusion that the Agency provided reasonable services.

Starting in July 2019, the Agency attempted to notice Father of the proceeding by leaving messages at his last known telephone numbers, including a number that had a voicemail greeting that including Father's first name. Approximately six months later, on January 31, Father finally came forward. Father reported that he dropped out of high school, but that he has experience working as a machinist and "has never had difficulty finding work." Although currently unemployed, Father was interviewing for positions and believed that his employment prospects were good. Father acknowledged arrests for possessing methamphetamine and domestic violence, stating he was both a victim and perpetrator of domestic violence with Mother. Father started using heroin, alcohol, marijuana and methamphetamine as a teenager, but denied any current substance use.

Father also reported being homeless, but the social worker explained that Father needed to "progress in services, demonstrate behavioral change, and progress in visitation before being eligible" for a Family Unification Program referral for section 8 housing.[5] The social worker noted that Father

---

[5] Under section 8 (42 U.S.C. § 1437f(o)), low income families apply for and obtain vouchers to assist in payment of rent. The amount of housing

"display[ed] zero insight" into the protective issue of physical abuse and domestic violence. Father's case plan included domestic violence education, parenting education, outpatient substance abuse, and substance abuse testing.

An April 14 status review report noted that Father had been referred to parenting and domestic violence education. Father completed a substance abuse assessment, but did not appear for his intake appointment. The social worker reported that Father did not have any concerns regarding Mother's ability to safely parent and denied that the older children had been physically abused. Father reported being homeless but employed. On April 8, Mother participated in a supervised 30-minute video visit with the children with Father in the background. The social worker noted that Father would have the same opportunity for weekly video visits.

On May 28, the Agency approved Father for individual therapy in lieu of domestic violence group therapy based on a shortage of male victim domestic violence classes, informed Father of this change, gave him the therapist's contact information, and requested that he schedule an intake and regular therapy sessions. On July 2, the therapist reported that Father had made no attempts to contact her for treatment. In the July 17 addendum report, the social worker reported that Father "has shown minimal efforts towards completing his case plan services. He has participated in one parenting class since his initial referral in May, has refused to contact his therapist in spite of many requests made by the social worker and refuses to participate in substance abuse services."

---

assistance is determined based on a percentage of the family's monthly income, determined by the public housing agency. (42 U.S.C. § 1437f(o)(4).)

At the six-month review hearing on July 17, the social worker explained that Father was not eligible for a substance abuse treatment housing voucher because Father had not successfully completed a substance abuse program. The social worker opined that Father's lack of housing was "not the protective issue" stating lack of housing "could be [an issue] in the future if [Father] were to make progress in services but at this time there are . . . more important concerns than housing at this time." Nonetheless, the social worker indicated that he provided Father with the county's telephone number for housing and other services.

During closing argument, Father's counsel reported that Father lived in a hotel and asserted that Father's lack of housing was "the only issue . . . that could prevent the children from being placed with [Father] today." Father requested that the substance abuse component be stricken from his case plan. The court denied the request at the continued hearing on September 1 stating, Father's "best course is to go back to the treatment program, be reassessed and convince them that . . . the program is no longer appropriate for him."

Between the start of the six-month hearing on July 17 and its completion on September 1, the social worker reported that Father demonstrated minimal and inconsistent efforts in his case plan. Father's therapist reported that Father refused to drug test, claimed he did not need parent training, and was "in denial in regards to his services and the allegations." Mother, however, reported ongoing abuse from Father and obtained a TRO against him. On August 19, Father was arrested for violating the TRO, disorderly conduct and possessing a controlled substance and/or drug paraphernalia.[6]

---

[6] A few days before his arrest, Father tested negative for any substances.

Accordingly, during the reporting period prior to completion of the six-month hearing, Father denied the existence of any safety issues, the need for parent training and refused to drug test. During this time Father was homeless or living in a hotel. Father has not cited, and we have not located, anywhere in the record where Father informed the social worker that he could not access services due to lack of internet access or a place to charge his phone.

During the reporting period relevant to this appeal, September 1 to the time of trial on January 13, 2021, Father started to participate in services, but displayed little progress. Father was released from jail on September 4, after being incarcerated for violating the TRO against him. The social worker reported that although Father was homeless and unemployed, he had recently began participating in services. During Father's first group parenting session, Father "mocked" other parents and made parents and the staff uncomfortable. With respect to Father's individual therapy done in lieu of domestic violence group therapy, Father reported that he lost the counselor's phone number when he lost his phone and forgot the therapist's name. After the social worker helped Father make contact with the therapist, Father failed to show for a meeting. Father missed another appointment with the therapist claiming that his phone had been stolen. Regarding substance abuse services, Father reported that he voluntarily entered an outpatient program, but Father had not signed a release of information and the social worker had not been able to obtain any updates as to Father's compliance and progress.

In a status review report dated October 13, the Agency noted that Father denied any drug use. However, in late October, Father tested positive for methamphetamine. The outpatient substance abuse program then

discharged Father the week of November 9, with the counselor reporting that Father "seemed very angry and resistant to the program" and "was aggressive and disrespectful." The social worker reported that Father did not engage in therapy, denied any protective issues, and that Father had been terminated from individual therapy.

After Father disclosed that he had been " 'ordered' " to a group domestic violence offender's group in his criminal case, the social worker referred Father to a group domestic violence program. Father was denied the service based on "[i]nsufficient history and documentation of the incidents." Although Father had supervised visits with the children, on November 24 the Agency learned that the visitation center terminated Father's visitation due to "non-compliance and threat[s] to the visitation monitor." Father was scheduled to resume visitation at the Child Welfare Services office the week of December 14. Although Father agreed to drug test on November 24 and December 18, Father failed to appear for the drug tests.

In an addendum report dated December 16, the social worker recommended that Father's services be terminated, reporting that Father "is unable to acknowledge that his negative choices and patterns of behaviors continue to hinder his progress. From the onset of the case, [Father] challenged Agency recommended services and once he agreed to participate, the providers report non-compliance and aggressive conduct. [¶] It remains in [Father's] best interest, . . . to seek help towards addressing his substance use and trauma if he wants to have a positive, safe and nurturing relationship with his children." Again, Father has not cited, and we have not located, anywhere in the record during the relevant reporting period where Father informed the social worker that he could not access services due to lack of internet access or a place to charge his phone.

11

An addendum report dated January 13, 2021, reported that Father resided in a sober living facility, but the Agency had not been able to confirm this, or whether Father had re-enrolled in outpatient substance abuse treatment. In the meantime, Mother demonstrated behavioral changes with no safety concerns and had progressed to unsupervised visits with the two older half-siblings. The social worker opined a substantial probability existed that the children could be returned to Mother by the 18-month hearing date.

Although Father testified that his homelessness caused his poor performance in satisfying his case plan, specifically the lack of internet access and a place to charge his phone, the juvenile court implicitly rejected this testimony. "A trier of fact is free to disbelieve a witness, even one uncontradicted, if there is any rational ground for doing so." (*In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1043.) The record, recounted above, provided the juvenile court with rational grounds to disbelieve Father's testimony.

Father has not shown that the Agency did not act in good faith or that its case plan was unreasonable. The Agency tailored Father's case plan to remedy the issues identified during his initial interview as impediments to Father gaining custody of the children, including substance abuse treatment, drug testing, domestic violence education, and parenting education. As the social worker explained at the six-month hearing, Father's lack of housing was "not the protective issue" but could become an issue should Father progress in services.

The record shows that Father is not intellectually disabled and that he had marketable job skills as a machinist. At various points in the proceeding, Father was able to find employment and a place to live. Additionally, the social worker provided Father with the county's telephone number for housing and other services. Moreover, given Father's refusal to

12

treat his substance abuse issues and regularly drug test, even if the Agency had provided Father with housing, this housing would remain unsafe for the children. (§ 300.2 ["The provision of a home environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child."].)

On these facts, Father has not established that the Agency failed to provide reasonable reunification services with respect to housing.

Father next complains that the Agency did not reassess his case plan or offer any services to address his anger and aggression issues. He claims that when he violated the TRO in August 2020 based on allegations of stalking, property damage and threats, the Agency should have offered him a service to address aggression. Father, however, received individual therapy in place of domestic violence group therapy. Over a month after the individual therapy referral, and despite numerous e-mails between Father and the social worker, Father made no attempt to contact the therapist. On July 22, the social worker spoke to Father's therapist who reported that Father "continue[d] to be in denial in regards to his services and the allegations." On August 14, the social worker spoke to Father regarding therapy with Father stating, " 'I don't feel like it's a therapy . . . it's like someone is trying to push an agenda on you. She tells me to do this . . . . She's an agenda person.' "

On September 11, the social worker assisted Father in calling the therapist and left the therapist a message. On October 7, however, Father reported that he had not contacted the therapist because he lost his phone. Father finally contacted the therapist on October 9 and scheduled an appointment for October 12. Father missed this appointment claiming his phone had been stolen. On December 2, the therapist informed the social worker that Father "continues to deny the protective issue", "made 'bizarre

13

statements' regarding" the social worker " 'selling' " the children and getting " 'paid' " for them, and that Father displayed no " 'empathy' for his children." On December 7, Father told the social worker "that he wanted to terminate his therapist as he felt he was not getting a " 'positive response.' " The following day, the Agency re-referred Father to individual therapy. At the time of the January 13, 2021, addendum report Father's referral was still pending.

Here, the Agency offered Father reasonable services in conformity with his case plan. Other than reporting a history of domestic violence, Father did not indicate he had anger or aggression issues during his initial interview. Although Father had two arrests for disorderly conduct, his criminal history does not show problems related to anger or aggression. If Father believed that his 11 months of reunification services had been misdirected and should have focused on anger management or aggression issues, he "had the assistance of counsel to seek guidance from the juvenile court in formulating a better plan." (*In re Christina L.* (1992) 3 Cal.App.4th 404, 416 (*Christina L.*).) Father was not entitled to sit back and wait until the contested 12-month review hearing to have counsel raise the issue for the first time. The standard is not whether the Agency could have provided better services in an ideal world, but whether it provided reasonable services under the circumstances. (*Misako, supra,* 2 Cal.App.4th at p. 547.)[7]

_____

[7]    It is well documented that methamphetamine has been associated with hostility, aggression or violence. (See *People v. Schultz* (2020) 10 Cal.5th 623, 643; *People v. Hardy* (2018) 5 Cal.5th 56, 69; *People v. Martinez* (2009) 47 Cal.4th 399, 413; *People v. Kipp* (2001) 26 Cal.4th 1100, 1119; *In re Alexzander C.* (2017) 18 Cal.App.5th 438, 442-443, disapproved on other grounds by *Conservatorship of O.B., supra,* 9 Cal.5th at p. 1010, fn. 7; Meredith Cusick, Mens Rea and Methamphetamine: High Time for A Modern Doctrine Acknowledging the Neuroscience of Addiction (2017) 85

The record here, viewed in the light most favorable to the juvenile court's ruling, includes substantial evidence to support a finding that the Agency acted reasonably to assist Father in overcoming impediments to him gaining custody of the children but that Father chose not to participate in the services offered. (*In re Jonathan R.* (1989) 211 Cal.App.3d 1214, 1220 ["Reunification services are voluntary, and cannot be forced on an unwilling or indifferent parent."].) Accordingly, we conclude that substantial evidence supports the juvenile court's finding that, under the circumstances, the Agency offered reasonable services to Father between the six-month and 12-month review hearings.[8]

---

Fordham L. Rev. 2417, 2432 ["[M]ethamphetamine addiction is associated with social-cognitive impairments, such as emotion dysregulation, and associated maladaptive behaviors, including impulsivity, aggression, and even psychosis."].) Had Father fully participated in substance abuse treatment and testing, Father may have learned about this connection.

[8] Father suggests counsel for the Agency improperly argued that Father had the burden to file a JV-180 to change his case plan, but this argument is contrary to the legislatively mandated burden on the Agency to provide services. At the 12-month hearing, counsel for the Agency pointed out on rebuttal that if Father was dissatisfied with the requirements of his case plan that he had the right to file a motion and ask that his case plan be amended, but that he failed to do so. With this argument the Agency's counsel pointed out the principle articulated in *Christina L., supra*, 3 Cal.App.4th 404 that Father, through his counsel, could have sought guidance from the juvenile court in formulating a better case plan. (*Id.* at p. 416 [" ' "The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them." ' "].)

DISPOSITION

The order is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

HALLER, J.

AARON, J.